**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| YOLANDA M. AGUIRRE, *et al.* | § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-05-3198 |
| SBC COMMUNICATIONS, INC., *et al.* | § § § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Plaintiffs Yolanda Aguirre, Ana M. Morris, Corina Ramos, Rose Urdialez, Nara Deleon, Sylvia Diahnn Sanchez, Alejandra Amie, and Olga Zertuche filed this suit against their employer, Southwestern Bell Telephone L.P. (SWBT), asserting violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. Plaintiffs were "coach leaders" for SWBT. They allege that they were treated as exempt and paid salaries but should have been nonexempt employees paid for overtime hours at overtime rates. Plaintiffs allege that each branch of SWBT has at least eight coach leaders who were treated as salaried employees and not paid overtime, in violation of the FLSA. Plaintiffs move for conditional certification, notice, and expedited discovery under section 216(b) of the FLSA. Plaintiffs seek certification of a class of individuals who worked as coach leaders at SWBT from January 1, 2003 to the present. (Docket Entry No. 19). SWBT opposes the conditional certification and notice, asserting that plaintiffs have failed to show that they are "similarly situated" to each other, or that the misclassification claim is appropriate for collective treatment. (Docket

Entry No. 25).

Based on a careful review of the pleadings, the motion, response, and reply; the present record, and applicable law, this court denies plaintiffs' motion for notice and conditional certification. The reasons for this ruling are set out below.

**I.     Background**

Aguirre and the other named plaintiffs worked as "coach leaders" in a SWBT Park West Call Center in Houston, Texas. A coach leader, also known as a Call Center Manager, is treated by SWBT as a supervisory position. Plaintiffs allege that their duties are primarily clerical, consisting of "observing and monitoring of employees, inputting and documenting employees calls, speaking with employees as to areas of improvement." (Docket Entry No. 19 at 2). Plaintiffs assert that they lack college or professional degrees, did not have "full" authority to hire or fire employees, lacked control over the hours they worked, and had "little, if any, discretion in performing [their] primary job duties." *Id*.

In response, SWBT has submitted affidavits from Sophia Pena, Associate Sales Director for SWBT in the same location plaintiffs worked from July to August 2005 and from November 2005 to the present, and from Nancy Garcia, now the Manager/Special Services Engineering and an Associate Sales Director in the same location from November 1999 to November 2005 (except for July to August 2005, when she was out on disability). Pena and Garcia both describe the call managers' responsibilities in that location, as follows:

> Responsibilities of Call Center Managers in the Diverse
> Market Group at the Park West Call Center concern two distinct
> sections: Developmental, related to achieving the production

2

>and performance goals for the Customer Service Representatives in the Diverse Market Group, and Administrative, relating to the administration of attendance and other administrative matters affecting Customer Service Representatives in the Diverse Market Group.  Developmental Managers generally are responsible for supervising the development, performance and positive discipline of the team of Customer Service Representatives assigned to that Call Center Manager.  The Administrative/Attendance Manager generally is responsible for supervising the performance and providing positive discipline of clerical employees who handle clerical duties related to the administration of the Diverse Market Group at the Park West Location, including particularly the administration of attendance issues, for monitoring and providing positive discipline relating to attendance for all Customer Service Representatives in the Park West Center Diverse Market Group, and for supervising a team of experienced Customer Service Representatives who provide training and support to their peers on "back-fill" duties, and hence are called "Back-fills."

(Docket Entry No. 25, Ex. 1).  Pena emphasized that the responsibilities of call center managers varied from "time to time and from manager to manager."  Their duties, however, always included:

>supervising many more than two full-time, subordinate employees, including, among other duties, the responsibility (i) to handle certain disciplinary matters and to make recommendations about others, up to and including termination of employment, (ii) to apply the union contract in behalf of management as its first level of authority, such as adjusting certain grievances and make recommendations about others, (iii) to administer policies that directly affect their team of subordinate employees, (iv) to authorize certain adjustments of customer accounts up to $200, (v) to determine whether performance is meeting standards set by management and to take responsive action if it is not, and (vi) to achieve revenue and/or customer service objectives for the unit.

(*Id.*)

Pena described the duties of "developmental" call center managers, distinguishing them from "administrative/attendance" call center managers' duties:

> Presently, Call Center Managers in the Developmental Section of the Call Center each supervise teams ranging from fifteen to more than 30 Customer Service Representatives on the Call Center floor. The teams are designated based upon achievement of performance objectives (such as teams made up of Customer Service Representatives who achieve a particular performance level) or based upon a defined management need (such as the team of Customer Service Representatives assigned to handle customers calling in the cancel their accounts).
>
> Developmental Call Center Managers have the authority to handle and adjust certain grievance issues according to the requirements of the union contract (e.g., grievances about vacation or work schedules) and may contact the union if they identify performance problems with a certain Customer Service Representative. The Developmental Call Center Managers have the authority to determine when to revoke certain rights granted to employees under the union contract. They also have authority to work with union regarding disciplinary decisions and make decisions regarding when to escalate discipline to me.
>
> The Developmental Call Center Managers have authority to recommend discipline, including termination of a Customer Service Representative's employment, and I, in turn, then make a recommendation relying upon the Call Center Manager's input and observations, as well as my own judgment.

(*Id.*)

By contrast, an "administrative/attendance" call center manager

> handling the Administrative Section of the Park West Call Center supervises five attendance clerks and a team of senior Customer Service Representatives called Back-Fills, who provided troubleshooting and training for less experienced Customer Service Representatives. These are her direct reports.

4

> The Administrative/Attendance Call Center Manager is authorized to handle performance and misconduct issues concerning her direct reports, and must decide when to escalate such issues to me. She also has authority to recommend termination of one of her clerks or "back-fills" for performance, and I would rely upon her input. In addition to coaching and developing her direct reports, the Administrative/Attendance Call Center Manager manages the attendance of all Customer Service Representatives. She has the ability to adjust or settle grievances if the union can prove that disciplinary action taken against the employee is incorrect. She may call the union representative if discipline is necessary and holds positive disciplinary meetings with employees; she also would meet to notify the Customer Service Representative of a suspension decision.
>
> The Administrative/Attendance Call Center Manager also has authority to recommend termination of the Customer Service Representatives with respect to attendance. I rely upon the Administrative/Attendance Call Center Manager's input in making my own recommendations about a termination or other disciplinary decision related to attendance, or relating to one of the clerks or Back-fills that the Administrative/Attendance Call Center Manager supervises.

(*Id.*)  Pena's affidavit summarized the variation in the duties of a call center manager on a day-to-day basis:

> Each of the Call Center Managers manages separate teams of employees. Because each team of employees has different needs and issues that arise, the management duties that each Call Center Manager actually performs on a day-to-day basis, and the time that each Call Center Manager spends performing any particular management duty, will vary, sometimes substantially, from Call Center Manager to Call Center Manager. For example, Call Center Managers sometimes must perform administrative tasks when necessary. On rare occasions, when a Back-fill Customer Service Representative is not available, the Call Center Managers may fill in for a Customer Service Representative and handle

5

> customer calls.  In addition, the Call Center Managers have different levels of involvement in the adjustment of Customer Service Representative grievances and in affecting the Customer Service Representatives' rights regarding performance review options under the union contract, depending upon the team of Customer Service Representatives for which they have responsibility.

(*Id.*)

Garcia similarly described the duties of call center managers and the variations among the managers' duties. She emphasized in her affidavit that "developmental" coach leaders

> had authority to handle performance and misconduct issues concerning their direct reports, including the authority to handle certain grievance issues according to the terms of the union contract (e.g., grievances about vacation or work schedules) and could contact the union if they identified performance problems with a certain customer service representative.  The Call Center Developmental Managers also had authority to work with the union regarding disciplinary decisions and used their judgment regarding when to escalate discipline.
>
> Developmental Coach Leaders who reported to me also had authority to recommend termination of customer service representatives.  Most decisions by Developmental Coach Leaders to recommend termination were based on established standards and guidelines provided by SWBT.  If the Coach Leader wished to deviate from these established standards and guidelines, the Developmental Coach Leader was required to consult with Human Resources and to explain her rationale to me, and I would consider the rationale in deciding my recommendation for the final termination decision.  All terminations had to have my General Manager's and Vice President's approval, along with the Human Resources Department's concurrence, and was based upon input via a separation proposal put together by the Call Center Manager.

(Docket Entry No. 25, Ex. 2).  "Administrative/attendance" call center managers

>supervised five clerks plus the "Back-fills" in the Call Center. In addition to coaching and developing her direct reports, the Administrative Coach Leader managed the attendance of all Customer Service Representatives. In addition, the Administrative Coach Leader was responsible for ensuring that customer service representatives were scheduled for work and were properly trained by the "back-fills." She also was responsible for "force issues," which included such things as having the clerks keep up with trade time, flex time, customer callbacks, etc. Finally, the Administrative/Attendance Coach Leader handled the first level of employee grievances for items pertaining to her direct reports, to attendance, and to sales-incentive issues for all Customer Service Representatives. She had the authority to adjust or settle grievances with the union.
>
>The Administrative/Attendance Call Center Manager was required to handle performance and misconduct issues concerning her direct reports. An Administrative/Attendance Coach Leader's input for termination often was relied upon in making the final termination decision, and usually involved terminating someone with severe attendance issues.

(*Id.*)

These affidavits are not controverted by any affidavits or declarations from the plaintiffs. In their motion for notice, plaintiffs assert that they performed primarily clerical duties, did not control the hours they worked, did not have a college or professional degree, and did not have "full" authority to hire or fire employees. (Docket Entry Nos. 13, 19).

## II. The Applicable Legal Standards

Section 207(a) of the FLSA requires covered employers to compensate nonexempt employees at overtime rates for time worked in excess of statutorily-defined maximum hours. 29 U.S.C. § 207(a). Section 216(b) creates a cause of action for employees against

7

employers violating the overtime compensation requirements. 29 U.S.C. § 216(b). Section 216(b) provides:

> An action . . . may be maintained . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

*Id.* Section 216(b) establishes an "opt-in" scheme under which plaintiffs must affirmatively notify the court of their intention to become parties to the suit. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995). District courts have discretion in deciding whether to order notice to potential plaintiffs. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170–171 (1989); *Villatoro v. Kim Son Rest., L.P.*, 286 F. Supp. 2d 807, 808 (S.D. Tex. 2003).

Courts recognize two methods to determine whether to authorize notice to similarly-situated employees advising them of their right to join an FLSA collective action. These methods are the two-step *Lusardi* approach and the spurious class action *Shushan* approach. *See id.*; *Shushan v. Univ. of Colo. at Boulder*, 132 F.R.D. 263 (D. Colo. 1990); *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). In *Mooney,* the Fifth Circuit found it unnecessary to determine which method is most appropriate. 54 F.3d at 1216. Most courts use the "two-step *ad hoc* approach" as the preferred method for making the similarly-situated analysis, rather than the Rule 23 requirements. *See Basco v. Wal-Mart Stores Inc.*, 2004 WL 1497709, at *4 (E.D. La. July 2, 2004); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 n.12 (11th Cir. 1996) (noting that "the requirements for pursuing a § 216(b) class action are

independent of, and unrelated to, the requirements for class action under Rule 23"); *LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 288 (5th Cir. 1975) (finding a fundamental difference between Rule 23 class actions and FLSA collective actions); *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004) (stating that the majority of courts have employed or implicitly approved the two-step method); *Villatoro*, 286 F. Supp. 2d at 810.

"*Lusardi* and its progeny are remarkable in that they do not set out a definition of 'similarly situated,' but rather they define the requirement by virtue of the factors considered in the [two-stage] analysis." *Mooney*, 54 F.3d at 1213. The first step of analysis is the "notice stage" in which the district court decides whether to issue notice to potential class members. *See id.* at 1213–1214. The court's decision is often based only on the pleadings and affidavits that have been submitted. *Id.* "Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class" that provides potential class members with notice and the opportunity to opt-in. *Id.* at 1214 n.8. Even this lenient standard appears to require substantial allegations that potential members "were together the victims of a single decision, policy, or plan . . . ." *Id.* (citing *Sperling v. Hoffmann-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988)). A factual basis for the allegations is needed to satisfy this first step. *See Hall v. Burk*, 2002 WL 413901, at *3 (N.D. Tex. Mar. 11, 2002) (stating that "[u]nsupported assertions of widespread violations are not sufficient to meet Plaintiff's burden"); *see also Haynes v. Singer Co., Inc.*, 696 F.2d 884, 887 (11th Cir. 1983). Some courts place an

emphasis on finding "some identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency." *Barron v. Henry County Sch. Sys.*, 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003) (citing *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 416 (D. Or. 2002)); *see Basco*, 2004 WL 1497709, at *5 (quoting *Heagney v. European Am. Bank*, 122 F.R.D. 125, 127 (E.D.N.Y. 1988) (stating that certification is appropriate when some factual nexus binds the named plaintiffs and potential class members as victims of a particular alleged policy or practice)). "A court may deny plaintiffs' right to proceed collectively if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice." *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005); *see Barron*, 242 F. Supp. 2d at 1104 ("[T]he mere fact that violations occurred cannot be enough to establish similarity, as that would not ultimately be sufficient to establish a pattern and practice without a showing that the violations were more than sporadic occurrences."). If a court conditionally certifies a class, the action proceeds as a collective action during discovery. *See Mooney*, 54 F.3d at 1214.

The second stage typically occurs when discovery is largely complete and the defendant moves to "decertify" the conditionally-certified class. *See id.*; *Lusardi*, 118 F.R.D. at 359. At that point, the court makes a factual determination as to whether there are similarly-situated employees. *Id.* If the district court finds that the claimants are similarly situated, the collective action may proceed. *See Mooney*, 54 F.3d at 1214; *Basco*, 2004 WL 1497709, at *3. If the court decertifies the class, the opt-in plaintiffs are dismissed without prejudice and the original plaintiffs proceed on their individual claims. *See id.*; *England*, 370

F. Supp. 2d at 508.

Section 13(a)(1) of FLSA exempts employees occupying "bona fide executive, administrative, or professional" positions from the overtime requirements of section 7.  29 U.S.C. § 213(a)(1).  "The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part."  *Id.*  The Code of Federal Regulations provide a "short test" to classify employees for the executive or administrative exemptions.  An employee can be classified as an exempt executive if: (1) the employee is paid a salary of not less than $455 per week; (2) the employee's primary duty is the management of the enterprise or a subdivision; (3) the employee customarily and regularly directs the work of two or more employees; and (4) the employee has the authority to hire or fire other employees, or the authority to recommend such actions.  29 C.F.R. § 541.1(a).  An employee can be classified as an exempt administrative employee if: (1) the employee is paid a salary of not less than $455 per week; (2) the employee's primary duty is the performance of office or nonmanual work directly related to the management or general business of the employer; and (3) the employee's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.  29 C.F.R. § 541.2.

Plaintiffs do not appear to dispute that they are paid on a salary basis and earn more than $455 per week.  Instead, plaintiffs allege that they do not have primarily managerial or supervisory duties under 29 C.F.R. §§ 541.1 and 541.2.  *See York v. City of Wichita Falls, Tex.*, 944 F.2d 236, 241 (5th Cir. 1991).

11

**III.    Analysis**

This case presents several problems for conditional certification and notice.  First, plaintiffs' conclusory and unsupported allegations are inadequate even for first-stage certification and notice, particularly given the affidavits from Pena and Garcia describing significant differences in coach leaders' job duties.  The first-stage test requires a minimal showing by the plaintiff that (1) there is a reasonable basis for crediting the assertions that aggrieved individuals exist, (2) that those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted, and (3) that those individuals want to opt-in to the lawsuit. *See, e.g., Haynes*, 696 F.2d at 887; *H&R Block*, 186 F.R.D. at 400; *Dybach*, 942 F.2d at 1567-68; *D'Anna*, 903 F.Supp at 894; *Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358 (M.D. Ala. 1999).  As noted, most courts require some factual support for the complaint allegations of classwide discrimination to authorize notice.  *See, e.g., Severtson v. Phillips Beverage Co.,* 137 F.R.D. 264, 266 (D. Minn. 1991) (allegations of plaintiff alone insufficient); *Thiessen v. General Electric Capital Corp.*, 996 F. Supp. 1071(D. Kan. 1998) (pleadings plus 30 opt-in forms filed sufficient); *Sperling v. Hoffman-La Roche*, 118 F.R.D. 392, 406 (D.N.J. 1988) (pleadings plus 400 opt-in forms filed sufficient); *Felix de Asencio v. Tyson Foods Co.*, 130 F. Supp. 2d 660, 663 (E.D. Pa. 2001) (pleadings and four declarations from putative class members sufficient).  In this case, plaintiffs have not submitted affidavits or other information beyond the brief and conclusory statements in the complaint and motion for notice.

Second, the record shows that determining whether other potential plaintiffs are similarly situated would require a fact-specific and individualized inquiry into each employee's daily job duties. For some employees, including the named plaintiffs, the inquiry would extend into the number of employees supervised; the ability to recommend hiring, firing, and reprimanding workers; the employee's opportunity to exercise discretion, and the amount of time the employee spends on nonmanagerial tasks. *See* 29 C.F.R. §§ 541.1, 541.2.

The members of the proposed opt-in class have two job titles – Development Coach Leader and Administrative/Attendance Coach Leader – but employees with the same job title are not "similarly situated" for the purposes of an "opt-in" FLSA class if their day-to-day job duties vary substantially. *Morisky*, 111 F. Supp. 2d at 495, 499 n.8 ("Technical Analysts" for the defendant were not similarly situated where one was assigned to operations, one to maintenance, and one quality assurance, and accordingly, the focus of their work differed); *Tumminello v. U.S.,* 14 Cl.Ct. 693, 696 (Ct. Cl. 1988) ("employees within the Defense Mapping Agency of similar grade (GS-11) and job category (Electronics Technician)" were not similarly-situated because they were employed in different federal agencies and in various job categories).

In this case, plaintiffs do not make even a minimal showing that all coach leaders perform the same type of work or exercise the same amount of discretion. The evidence in the record shows that some coach leaders are assigned duties that require them to exercise more discretion and independent decision-making on a daily basis than other coach leaders, and that an individual coach leader's duties often vary from day-to-day and change over

13

time. The record shows that coach leaders manage separate teams of hourly-paid customer service representatives and clerks. A coach leader's duties vary depending on whether they are working as developmental managers or as administrative/attendance managers, which team each coach leader is supervising at a given time, whether other supervisors or team members are absent, and whether the coach leader is herself on "performance improvement plans" or given specific assignments by her supervisor or manager, requiring specific duties or tasks. (Docket Entry No. 25, Ex. 1, ¶¶ 6–14; Ex. 2, ¶¶ 7–13).

A number of courts have refused to certify a class, even conditionally, when determining whether the employer improperly treated the plaintiffs as nonexempt would require a highly individualized, fact-intensive inquiry. *See Reich v. Homier Distributing Co., Inc.*, 362 F. Supp. 2d 1009, 1013–14 (N.D. Ind. 2005); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1274–75 (M.D. Ala. 2004); *Morisky v. Public Service Elec. and Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000). The present record shows that the differences among coach leaders predominate over their similarities and will require individual inquiry at trial. Because the exempt or nonexempt status of the opt-in plaintiffs would need to be determined on an employee-by-employee basis, litigating this case as a collective action would not be efficient. *Holt,* 333 F.Supp.2d at 1274 (variations in evidence concerning amount of time spent running a cash register, stocking shelves, making signs, etc. versus managing the retail store defeated any claim that the day-to-day tasks of store managers and assistant managers were sufficiently similar to designate a class for the purposes of deciding if they were properly designated as exempt); *Koren v. SUPERVALU, Inc.,* 2003 WL 1572002, *16

(D.Minn.2003) (opt-in plaintiffs performing different job duties are not appropriate for class treatment).

On the present record, the motion for certification and notice is denied.

SIGNED on April 11, 2006, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge