IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| YOLANDA M. AGUIRRE, *et al.* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-3198 |
| | § | |
| SBC COMMUNICATIONS, INC., *et al.* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

## I.    Procedural Background

On September 15, 2005, Yolanda Aguirre, Ana Morris, Corina Ramos, Rose Urdialez, and Olga Zertuche filed this suit against SBC Communications, Southwestern Bell Telephone Company, and Southwestern Bell Telephone L.P.  The plaintiffs alleged that they were misclassified as exempt employees and not paid overtime, in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*  In a December 8, 2005 first amended complaint, Nara Deleon, Sylvia Diahnn Sanchez, and Alejandra Amie were added as plaintiffs.  In these complaints, the plaintiffs alleged that they presently or in the past worked in the Diverse Marketing Group of the SWBT Call Center in Houston, Texas, as Developmental Coach Leaders.

On May 25, 2006—the day before the scheduling order deadline for amending pleadings without leave of court—the plaintiffs filed a second amended complaint adding a claim that Sanchez had been retaliated against for filing suit.  On March 9, 2006, the

plaintiffs filed an expedited motion seeking conditional certification and court-ordered notice to putative members of the proposed collective action, defined as Developmental Coach Leaders and Administrative/Attendance Coach Leaders working at SWBT after January 1, 2003. (Docket Entry No. 19). This court denied that motion on April 11, 2006, finding that the plaintiffs had failed to show that they were similarly situated to members of the putative class and that the misclassification claim was suitable for collective action treatment, as required for conditional certification and notice. (Docket Entry No. 26).

On May 16, 2006, the plaintiffs filed a renewed motion for notice to the potential plaintiffs and for limited expedited discovery. (Docket Entry No. 28). This renewed motion sought conditional certification for a subset of the original proposed putative class. The renewed motion sought certification of a class only of Developmental Coach Leaders who worked at SWBT after January 1, 2003, on the basis that they were misclassified as exempt. No collective-action treatment was sought as to the Administrative/Attendance Coach Leaders.

The defendants moved to strike this renewed motion for certification and notice on the basis that the pleadings did not allege a collective action or factual basis for a collective action. (Docket Entry No. 35). The defendants also filed a detailed response opposing the renewed motion for notice on the ground that even as to this smaller proposed class, the plaintiffs had failed to show that they were similarly situated so as to make collective action treatment appropriate. (Docket Entry No. 37). Both sides have presented affidavits and excerpts from depositions as well as other documents.

2

On July 18, 2006, the plaintiffs moved for leave to file a third amended complaint. The plaintiffs sought leave to add collective-action allegations, arguing that their desire to have the case proceed as a collective action had been clear since March 9, 2006. The plaintiffs also sought leave to add allegations that five of the named plaintiffs besides Sanchez had been retaliated against for filing this suit. (Docket Entry No. 39). In response, the defendants argued that the plaintiffs had not shown good cause for the delay in seeking the amendments and that adding the retaliation claims for the five plaintiffs would require reopening their depositions and other discovery. (Docket Entry No. 46). All of the named plaintiffs had been deposed before the plaintiffs filed the proposed third amendment complaint that added retaliation claims for five of the eight plaintiffs.

In support of the renewed motion for certification as a collective action, expedited discovery, and notice, the plaintiffs have submitted affidavits of Nara DeLeon,[1] Alexandra Amie,[2] Diahnn Sanchez,[3] and Yolanda Aguirre,[4] and deposition excerpts from Yolanda

[1] Docket Entry No. 28, Ex. A.

[2] Docket Entry No. 28, Ex. B.

[3] Docket Entry No. 28, Ex. D.

[4] Docket Entry No. 28, Ex. E.

3

Aguirre,[5] Alexandra Amie,[6] Ana Morris,[7] Diahnn Sanchez,[8] Rose Urdialez,[9] Olga Zertuche,[10] and a nonplaintiff coach leader, Clarinda King.[11]  The defendants have submitted deposition excerpts from all eight plaintiffs.[12] The defendants have also submitted affidavits from Lynn Lehew, the General Manager of Consumer Sales,[13] Sophia Pena, an Associate Sales Director for SWBT Park West,[14] Erik Martinez, an Associate Sales Director for SWBT Park West,[15] and Nancy Garcia, now the Manager/Special Services Engineering and an Associate Sales Director in the Park West location.[16]

While the renewed motion for certification was pending, on December 22, 2006, the defendants filed a motion for summary judgment as to the claims asserted in the second amended complaint.  The defendants seek summary judgment as to both the individual

---

[5]Docket Entry No. 47, Ex. E.

[6]Docket Entry No. 47, Ex. F.

[7]Docket Entry No. 47, Ex. G.

[8]Docket Entry No. 47, Ex. H.

[9]Docket Entry No. 47, Ex. I.

[10]Docket Entry No. 47, Ex. J.

[11]Docket Entry No. 47, Ex. B.

[12]Docket Entry No. 37, Exs. H–O.

[13]Docket Entry No. 37, Ex. A.

[14]Docket Entry No. 37, Ex. B.

[15]Docket Entry No. 37, Ex. C.

[16]Docket Entry No. 37, Ex. D.

misclassification claims brought by Administrative/Attendance Coach Leaders and the misclassification claims brought by the Developmental Coach Leaders as to which collective treatment was sought. (Docket Entry No.55). The defendants also seek summary judgment on Sanchez's retaliation claim. (*Id.*). The plaintiffs have filed a response. (Docket Entry No. 62).

This memorandum and opinion addresses the motions relating to whether collective treatment of the Developmental Coach Leaders' misclassification claim is appropriate and whether any of the named plaintiffs besides Sanchez should be able to pursue individual retaliation claims. Based on a careful review of the pleadings, the motion, response, and reply; the present record, and applicable law, this court grants the plaintiffs' motion for leave to amend to include the collective-action allegation and denies the defendants' motion to strike the renewed motion for notice and conditional certification. This court, however, denies the plaintiffs' motion to certify the collective action, for expedited discovery, and for issuance of notice. This court also denies the plaintiffs' motion for leave to amend to add the retaliation claims for the five plaintiffs besides Sanchez. The reasons for these rulings are set out below.

This court will issue a separate memorandum and opinion addressing the defendants' motion for summary judgment and, if appropriate, issue a date for the joint pretrial order and docket call.

## II.    Factual Background

The plaintiffs worked as "Coach Leaders—Developmental Managers" or "Call Center

5

Managers" at different times in the Houston Diverse Marketing Group (DMG) of the SWBT Call Center.  The DMG provides services to customers who prefer the Spanish language. Coach Leaders are assigned to one of two groups:  the Developmental Section or the Administrative/Attendance Section.  Coach Leaders in both sections are classified as exempt and paid on a salary basis.  The Coach Leaders are in turn supervised by Area Service Managers (ASM).    Neither the plaintiffs nor the defendants submitted a formal job description for the Coach Leaders.

The evidence shows that the Developmental Coach Leaders' primary task is to supervise teams of up to 30 paid Service Representatives.  The job of a Service Representative is to receive telephone calls from customers, respond to those calls, and attempt to sell other products or services to those customers using a set script.  The parties agree that the primary job duties of Developmental Coach Leaders are listening to the Service Representatives as they handle such calls, monitoring the Service Representatives to determine whether company performance standards are met, completing written reports evaluating the Service Representatives' performance, providing feedback to the Service Representatives, and recommending to the Area Service Manager steps such as discipline or discharge of Service Representatives.  (Docket Entry No. 28 at 14, Ex. A, ¶ 11-13, Ex. B, ¶ 11-13, Ex. D, ¶ 11-13, Ex. E, ¶ 11-13; Docket Entry No. 37, Ex. A at 2–3 (affidavits of Deleon, Amie, Sanchez, Aguirre, and Pena); Docket Entry No. 37, Ex. I at 70–73, Ex. M at 70–71 (depositions of Amie and Deleon)).  The Administrative/Attendance Managers supervised the attendance of Service Representatives and other nonmanagerial employees

6

in the DMG, supervised clerical employees, and supervised certain more experienced Service Representatives, known as "backfills," who provided training and support to their less-experienced peers.

The defendants classify both categories of Coach Leaders as exempt managerial positions. It is undisputed that a Coach Leader is paid on a salary basis and receives more than $455 per week. It is also undisputed that the Service Representatives and clerical employees are paid on an hourly basis. (Docket Entry No. 37, Ex. B at 2). The Service Representatives and clerks are represented by the Communications Workers of America and work under a collective bargaining agreement between the union and SWBT. The Coach Leaders are statutory supervisors under the National Labor Relations Act, 29 U.S.C. §§ 1523(3), (11); 29 U.S.C. § 157.

In the prior motion seeking conditional certification as a collective action, the plaintiffs sought certification of a class of all Coach Leaders. This court denied the motion, finding that the plaintiffs had failed to show that they were similarly situated, as required for conditional certification as a collective action. In the present motion, the plaintiffs seek certification of a class consisting only of Developmental Coach Leaders, not including Administrative/Attendance Coach Leaders. The defendants assert that even as to this subset, the requirements for conditional certification are not met.

Although the parties dispute whether the evidence shows that the plaintiffs exercise discretion in their work and the amounts of time they spend on different job duties, there is little disagreement on the types of duties Developmental Coach Leaders perform. Pena, who

7

supervised seven of the eight plaintiffs when they worked as Developmental Coach Leaders,

described their duties as follows:

> [Coach leaders] for the Diverse Market Group each supervised teams of 15–25 Customer Service Representatives on the Call Center floor. The number of Customer Service Representatives assigned would increase if the Diverse Market Group was short on Managers available to work due to disability, retirements, or other absences.
>
> When I supervised them, Developmental Managers had the authority to handle performance and misconduct issues concerning their direct reports, including the authority to handle certain grievance issues according to the requirements of the union contract (e.g., grievances about vacation or work schedules) and could contact the union if they identified performance problems with a certain customer service representative. The Developmental Call Center Managers also had the authority to work with the union regarding disciplinary decisions and used their judgment regarding when to escalate discipline.
>
> Developmental Coach Leaders who reported to me also had authority to recommend termination of customer service representatives. Most decisions by Developmental Coach Leaders were based on established standards and guidelines provided by SWBT. If the Coach Leader wished to deviate from theses established standards and guidelines, the Developmental Coach Leader was required to consult with Human Resources and to explain her rationale to me, and I would consider the rationale in deciding my recommendation for the final termination decision. All terminations had to have my General Manager's and Vice President's approval, along with the Human Resource Department's concurrence, and was based upon input via a separation proposal put together by the Call Center Manager.

(Docket Entry No. 37, Ex. B at ¶9–11). Garcia, who supervised all eight plaintiffs during the

time they were assigned to work as Developmental Coach Leaders, similarly described their

8

duties.  (Docket Entry No. 37, Ex. D at ¶7–12).  According to both Pena and Garcia,

Development Call Managers' duties vary from "time to time and from manager to manager."

Their duties, however, always included:

> supervising many more than two full-time, subordinate
> employees, including, among other duties, the responsibility (I)
> to handle certain disciplinary matters and to make
> recommendations about others, up to and including termination
> of employment, (ii) to apply the union contract in behalf of
> management as its first level of authority, such as adjusting
> certain grievances and make recommendations about others, (iii)
> to administer policies that directly affect their team of
> subordinate employees, (iv) to authorize certain adjustments of
> customer accounts up to $200, (v) to determine whether
> performance is meeting standards set by management and to
> take responsive action if it is not, and (vi) to achieve revenue
> and/or customer service objectives for the unit.

(Docket Entry No. 37, Ex. B at ¶6, Ex. D at ¶7) (affidavits of Pena and Garcia).

The plaintiffs offered the following general descriptions of their duties as

Developmental Coach Leaders:

> The primary job function of Coach-Leaders is to monitor the job
> performance of the customer service representatives.  Each
> Coach-Leader supervises a team of representatives in a call
> center.  Each Coach-Leader is supervised by an Area Sales
> Manager (ASM).  The Area Sales Manager makes all important
> decisions regarding the supervision and discipline of
> representatives.  Coach-Leaders monitor each service
> representative's adherence to the sales script and sales
> productivity.  Monitoring also includes recognizing whether
> each S.R. has adhered to the company policy of how to proceed
> with a sales call, that is: whether the S.R. understood the
> customer's question or concern that prompted the in-coming
> call; whether the S.R. made a transition to the sales pitch;
> whether the S.R. has offered reasons to overcome the customer's
> objections to purchasing proffered service and whether the S.R.

9

made an aggressive close.   Coach-Leaders monitor service representative phone calls by listening to the conversation between the representatives and the customer.   Coach-Leaders are limited in the manner in which we may monitor representatives by the Monitoring Observation Agreement. According to the monitoring agreement, a Coach-Leader must notify a service representative before monitoring his or her call. Additionally, the Coach-Leader must give the representative the choice between having the Coach-Leader sitting beside the representative while monitoring, or listening to the call remotely from the Coach-Leader's office.   The only exception to this is when a service representative loses his or her "monitoring rights" as a result of disciplinary action.

Coach-Leaders are allowed no discretion in the exercise of their duties.   Instead, Coach-Leaders function according to the instructions and policies established by other SBC departments and higher-ranking SBC management.   Each Coach-Leader works under the supervision of an Area Sales Manager.   The ASM is the person who makes important decisions in each call center.   The treatment of service representatives is governed by their union contract and the monitoring agreement, and Coach-Leaders are therefore allowed to exercise no discretion in the decisions to discipline or terminate service representatives. Coach-Leaders do not have the authority to hire or terminate customer service representatives.   Coach-Leaders may make recommendations regarding discipline or termination of service representatives, but Coach-Leaders, as a general rule, do not even participate in the process required by the collective bargaining agreement when a termination action is conducted. Generally, Coach-Leaders present disciplinary and performance problems with S.R.s to the Area Sales Manager who makes the decision on how to proceed.   This is generally true even though the Coach-Leader may be the one to fill out the paperwork after the ASM makes the decision.   The duties and activities of Coach Leaders do not vary significantly from Coach-Leader to Coach-Leader or from day-to-day. . . .

Coach-Leaders participate in company conference calls approximately one to six hours per week.

10

(Docket Entry No. 28, Ex. A at ¶11–13, Ex. B at ¶11–13, Ex. D at ¶11–13, Ex. E at ¶11–13) (affidavits of Deleon, Sanchez, Aguirre, and Amie).

In evaluating the performance of the Service Representatives assigned to their team, the Developmental Coach Leaders complete Quality Performance Evaluation (QPE) forms. These forms ask the Developmental Coach Leader to evaluate more than seventy performance standards, some objective and some subjective.  The forms ask the Developmental Coach Leader, for example, to evaluate whether a Service Representative is assertive in recommending products to customers; correctly follows the script provided or deviates too much from that script; displays sufficient confidence during the call; or is sufficiently courteous during the call.  (Docket Entry No. 37, Ex. I at 73, Ex. J at 42–44) (depositions of Amie and Urdialez).

Besides monitoring the calls made by Service Representatives in their teams and preparing the reports documenting the Service Representatives' performance, the Developmental Coach Leaders provide feedback to the Service Representatives on their performance.  (Docket Entry No. 37, Ex. I at 95–96; Ex. L at 35–37) (depositions of Amie and Zertuche).  The Developmental Coach Leader also decides whether to discuss the Service Representative's performance with the ASM, whether to recommend that the ASM place the Service Representative on a performance improvement plan, or whether to recommend that the ASM discipline the Service Representative, including by job termination.  (Docket Entry No. 37, Ex. I at 95–97).

The evidence also shows that Developmental Coach Leaders handle the Service

11

Representatives' complaints and grievances, using the procedures required by the union contract that applies to the Service Representatives.  (Docket Entry No. 37, Ex. C at 6, Ex. D at 4).  Developmental Coach Leaders would notify the ASMs of a grievance.  The Developmental Coach Leaders would also represent management at the Service Representatives' grievance hearings, at which a union representative would also be present. (Docket Entry No. 56, Ex. B-7 at 105–07; Ex. B-9 at 66–67) (depositions of Aguirre and Deleon).  Some of the Developmental Coach Leaders exercised the authority to impose certain forms of discipline permitted under the union contract, including taking away a privilege called "monitoring rights."  (Docket Entry No. 56, Ex. B-7 at 110–12; Ex. B-8 at 64–65; Ex. B-14 at 108–11).  Other Developmental Coach Leaders did not exercise this authority, instead allowing the ASM to make that decision.  the ASM made that decision. (Docket Entry No. 56, Ex. B-9 at 68–69; B-12 at 38–39; Ex. B-13 at 26–27 (depositions of Deleon, Urdialez, and Zertuche)).

The evidence also shows that the Developmental Coach Leaders periodically held team meetings with the Service Representatives in their teams to review the team's performance and to review company policies, new products, and similar matters.  (Docket Entry No. 56, Ex. B-13 at 48–51; Ex. B-8 at 121–24) (depositions of Zertuche and Amie). In addition, the Developmental Coach Leaders were part of management-only conference calls, in which they learned about new methods and procedures that the teams of Service Representatives would be required to use.  (Docket Entry No. 56, Ex. B-7 at 60–61; Ex. B-8 at 107–09; Ex. B-12 at 57; Ex. B-13 at 48–49) (depositions of Aguirre, Amie, Urdialez, and

12

Zertuche).

Some Developmental Coach Leaders are also assigned special duties.  For example, plaintiff Aguirre and nonplaintiff Developmental Coach Leader Cynthia Aguilar were "Subject Matter Experts," charged with keeping up with information on specific products offered by the defendants, working with outside vendors on such products, and making sure that the Service Representatives had current information on these products.  Aguirre was the DMG's Subject Matter Expert on satellite dish services and Aguilar was the Subject Matter Expert for certain wireless products.   (Docket Entry No. 37, Ex. B at ¶10, Ex. C at ¶14).  Other Developmental Coach Leaders were assigned additional responsibilities as well.  Plaintiff  Urdialez was assigned the responsibility for "Customer Experience Expectations" (CEEs) in the DMG, which required her to keep track of the records documenting CEE results and covering them with the Service Representatives.   King was assigned the responsibility for the "retention team," a special group of service representatives which tries to keep current SWBT customers.  (Docket Entry No. 37 at 11, Ex. B at ¶10, Ex. C at ¶14) (affidavits of Pena and Martinez).

The parties appear to agree that the responsibilities of Developmental Coach Leaders change from time to time and vary from ASM to ASM.  (Docket Entry No. 56, Ex. B-6 at 88–89) (Garcia deposition).  The plaintiffs acknowledge that their duties were assigned by their direct supervisors, the ASMs, and that different ASMs assigned different duties.  The plaintiffs also acknowledge that their duties would change throughout the year, depending on what instructions were given by the ASMs.   "Plaintiffs do not have a consistent set of

13

duties that they performed.  The duties Plaintiffs performed are direct results of the Area Sales Manager's orders which changed throughout the year."  (Docket Entry No. 62 at 23). The defendants agree that the "job duties that each Plaintiff performs [and] the amount of time that each spends performing such duties . . . varies from Plaintiff to Plaintiff and from time-to-time." (Docket Entry No. 37 at 4).  The defendants point out that in addition to the differences resulting from the differences in each ASM's orders and management styles, there were differences among the teams of Service Representatives that affected the amount of time the Developmental Coach Leaders had to spend on monitoring, evaluating, and recommending discipline.  (*Id.* at 5–6).  The fact that some Developmental Coach Leaders were also assigned additional responsibilities, such as expertise in certain products or services, is another reason for the variation among the responsibilities performed.

Additionally, the defendants argue that the evidence shows that even in the tasks performed by every Developmental Coach Leader, individual Coach Leaders exercised different levels of discretion in carrying out these tasks.  (Docket Entry No. 37, Exs. E, F, G). For example, plaintiff Zertuche testified that she used her subjective understanding of whether a Service Representative made a sufficiently "aggressive close" in talking to a customer to satisfy the performance standard.  Plaintiff Deleon testified that she simply monitored whether the Service Representative followed the close provided in the approved script.  (Docket Entry No. 37, Ex. L at 121; Ex. M at 46–48).  Plaintiff Zertuche testified that she used her discretion to determine when to report low-performing Service Representative calls to the ASM, while plaintiffs Deleon and Urdialez testified that they were required to

14

report all calls that scored "below expectations" on the evaluation form.  (Docket Entry No. 37, Ex. J at 157, Ex. L at 27–28, Ex. M at 70–72).  As noted, some of the Developmental Coach Managers disciplined Service Representatives by, for example, taking away monitoring rights; other Developmental Coach Mangers left this to their ASM.

The evidence the parties have submitted is analyzed against the legal standards for conditional certification of a collective action under the FLSA.

## III.    The Motion for Conditional Certification

### A.    The Legal Standards

The plaintiffs allege that the defendants violated section 207 of the FLSA, which provides that an employee engaged in commerce must receive one and one-half times the regular rate of pay for hours worked in excess of forty hours per week.  29 U.S.C. § 207(a)(1).  Under section 216(b), employees may sue an employer that violates the overtime compensation requirements on behalf of other similarly situated employees, in a collective action.

> An action . . . may be maintained . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).  Section 216(b) establishes an "opt-in" scheme under which similarly situated employees must affirmatively notify the court of their intention to become parties to the suit.  *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995).  District

courts have discretion in deciding whether to order notice to potential plaintiffs to allow them to opt in to the suit. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170–171 (1989); *Villatoro v. Kim Son Rest., L.P.*, 286 F. Supp. 2d 807, 808 (S.D. Tex. 2003). Courts recognize two methods to determine whether to authorize notice to similarly situated employees advising them of their right to join an FLSA collective action. Both methods allow a court to determine whether the putative class members are similarly situated, making the case suitable for collective action treatment.

The two methods are the two-step *Lusardi* approach and the spurious class action *Shushan* approach. *See id.*; *Shushan v. Univ. of Colo. at Boulder*, 132 F.R.D. 263 (D. Colo. 1990); *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). Most courts use the "two-step *ad hoc* approach" as the preferred method for determining whether the putative class members are similarly situated, rather than the Rule 23 requirements. *See Basco v. Wal-Mart Stores Inc.*, 2004 WL 1497709, at *4 (E.D. La. July 2, 2004); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 n.12 (11th Cir. 1996) (noting that "the requirements for pursuing a § 216(b) class action are independent of, and unrelated to, the requirements for class action under Rule 23"); *LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 288 (5th Cir. 1975) (finding a fundamental difference between Rule 23 class actions and FLSA collective actions); *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004) (stating that the majority of courts have employed or implicitly approved the two-step method); *Villatoro*, 286 F. Supp. 2d at 810.

"*Lusardi* and its progeny are remarkable in that they do not set out a definition of

'similarly situated,' but rather they define the requirement by virtue of the factors considered in the [two-stage] analysis." *Mooney*, 54 F.3d at 1213.  The first step of analysis is the "notice stage" in which the district court decides whether to issue notice to potential class members. *See id.* at 1213–1214.  The court's decision is often based only on the pleadings and affidavits that named and some putative class opt-in plaintiffs have submitted. *Id.* "Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class" that provides potential class members with notice and the opportunity to opt-in. *Id.* at 1214 n.8. Even this lenient standard appears to require substantial allegations that potential members "were together the victims of a single decision, policy, or plan . . . ." *Id.* (citing *Sperling v. Hoffmann-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988)).  A factual basis for the allegations is needed to satisfy this first step. *See Hall v. Burk*, 2002 WL 413901, at *3 (N.D. Tex. Mar. 11, 2002) (stating that "[u]nsupported assertions of widespread violations are not sufficient to meet Plaintiff's burden"); *see also Haynes v. Singer Co., Inc.*, 696 F.2d 884, 887 (11th Cir. 1983). "A court may deny plaintiffs' right to proceed collectively if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice." *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005); *see Barron*, 242 F. Supp. 2d at 1104 ("[T]he mere fact that violations occurred cannot be enough to establish similarity, as that would not ultimately be sufficient to establish a pattern and practice without a showing that the violations were more than sporadic occurrences.").  If a court conditionally certifies a class, the action proceeds

as a collective action during discovery. *See Mooney*, 54 F.3d at 1214.

The second stage typically occurs when discovery is largely complete and the defendant moves to "decertify" the conditionally certified class. *See id.*; *Lusardi*, 118 F.R.D. at 359. At that point, the court draws on the expanded record and makes a factual determination as to whether the employees in the class are  similarly situated. *Id*. If the district court finds that the claimants are similarly situated, the collective action may proceed. *See Mooney*, 54 F.3d at 1214; *Basco*, 2004 WL 1497709, at \*3. If the court decertifies the class, the opt-in plaintiffs are dismissed without prejudice and the original plaintiffs proceed on their individual claims. *See id.*; *England*, 370 F. Supp. 2d at 508.

Several courts have concluded that when substantial discovery has occurred before the first conditional certification stage, the court may bypass the first stage and proceed directly to the second stage of the certification analysis. *See England*, 370 F. Supp.2d at 509 (stating that analysis under the second step was proper because substantial discovery had occurred, providing a sufficient record); *Basco*, 2004 WL 1497709, at \*4; *Pfohl v. Farmers Ins. Group*, 2004 WL 554834, at \*3 (C.D. Cal. Mar. 1, 2004) (finding that the second-step inquiry was appropriate when the parties agreed that sufficient discovery related to certification had been undertaken). In this case, the parties have conducted much more discovery than is usually available at the first step of the two-step analysis. The defendants have deposed all of the eight plaintiffs who are now parties to this case; the plaintiffs have deposed several of the defendants' representatives; and the parties have conducted extensive document discovery. Although this discovery is not so extensive as to proceed directly to

18

the second stage, all the depositions, affidavits, and documents are properly considered in deciding whether the first-stage requirements are met.  In considering this evidence, this court does not accept the substance of plaintiffs' affidavits or depositions over that submitted by the defendants, but examines the evidence to determine whether it is appropriate to certify a class of Developmental Coach Leaders to litigate the claim that they were misclassified as exempt employees and were wrongfully denied overtime compensation.

Employers are not required to provide overtime benefits to any employee employed in a bona fide executive capacity; such an employee is "exempt."  29 U.S.C. § 213(a)(1). Section 13(a)(1) of FLSA exempts employees occupying "bona fide executive, administrative, or professional" positions from the overtime compensation requirements.  29 U.S.C. § 213(a)(1).  "The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part."  *Id.*  The executive exemption duties test was streamlined in 2004 when a single duties test was adopted in section 541.100. An "employee employed in a bona fide executive capacity" means any employee:

(1) compensated on a salary basis at a rate of not less than $455 per week ($23,600 per year);

(2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) who customarily and regularly directs the work of two or more other employees; and

19

(4) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.  29 C.F.R. § 541.100(a) (2005).[17]

Under both the former and current regulations, if an employee spends more than 50% of the work day managing, management is the employee's primary duty.  29 C.F.R. § 541.700 (2005); 29 C.F.R. § 541 .103 (2004).  When an employee spends less than 50% of the work day engaged in managerial duties, the employee might nevertheless be primarily a manager if other pertinent factors support such a conclusion.  To determine whether an employee's primary duty involves management, in addition to the time spent on managerial tasks, a court can consider:  (1) the relative importance of the managerial duties as compared with other types of duties; (2) the frequency of the employee exercising discretionary powers; (3) the employee's relative freedom from supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the exempt employee.  *See Auer v. Robbins*, 65 F.3d 702, 712 (8th Cir.1995); 29 C.F.R. § 541.700(a) (2005); 29 C.F.R. § 541.103 (2004).

---

[17] The former FLSA regulations state than an employee qualifies under the executive exemption if that employee: (1) is paid a salary of not less than $250 per week ($13,000 per year); (2) has management as the primary duty; and (3) supervises two or more employees. 29 C.F.R. § 541.1(f) (2003).  Changes to the executive exemption requirements became effective August 23, 2004. 29 C.F.R. § 541.100. Members of the purported class will have different legal standards applicable to them depending on whether they were Developmental Coach Leaders only before August 23, 2004, or whether they were in that position after that date as well.  Federal courts have held that the new regulations do not apply retroactively. *See, e.g., Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 369 (7th Cir. 2005); *Tiffey v. Speck Enters., Ltd.*, 418 F.Supp.2d 1120, 1124 n. 3 (S.D.Iowa 2006); *Smith v. Heartland Auto. Servs., Inc.*, 404 F.Supp.2d 1144, 1148 n.2 (D.Minn.2005).  The Fifth Circuit has refused retroactively to apply other FLSA statutory—not regulatory—amendments that were not expressly made retroactive. *See Vela v. City of Houston*, 276 F.3d 659, 674 (5th Cir. 2001).

The plaintiffs allege that the Developmental Coach Leaders are improperly classified under the executive exemption and that they should be entitled to overtime pay if they work in excess of forty hours in a week. The plaintiffs assert that they do not spend sufficient time on managerial duties and that they exercised too little discretion to be classified as exempt employees. The issue to be determined at this stage is not whether the work the plaintiffs did was primarily managerial, how much time was spent on specific tasks, or how much discretion the plaintiffs exercised, but whether the plaintiffs were similarly situated in the kind of duties they had, the amount of time they spent on these duties, and the extent of discretion they exercised, to make conditional certification for collective treatment appropriate.

**B.    Analysis**

1.    *The Defendants' Motion to Strike the Renewed Motion for Notice and the Plaintiffs' Motion for Leave to Amend to Add Collective Action Allegations to the Complaint*

The defendants argue that this renewed motion should be stricken on the basis that the complaint on file when the motion was filed contained no collective-action allegation. (Docket Entry No. 35 at 4). The plaintiffs respond and move for leave to amend to add this allegation in their third amended complaint. (Docket Entry No. 40 at 8).

The plaintiffs point to Rule 15(a) of the Federal Rules of Civil Procedure, which states that leave to amend pleadings "shall be freely given when justice requires." The defendants respond that the good-cause standard under Rule 16(a) of the Federal Rules of Civil Procedure applies because the motion for leave to amend to file the third amended complaint

was not filed until July 18, 2006 and the court's scheduling order set May 26, 2006 as the deadline for amending pleadings.

The defendants are correct that "Rule 16(b) governs amendment of pleadings after a scheduling order deadline has expired."  *S&W Enterprises, L.L.C. v. SouthTrust Bank*, 315 F.3d 533, 535 (5th Cir. 2003).  "Rule 16(b) provides that a scheduling order 'shall not be modified except upon a showing of good cause and by leave of the district judge.' The good cause standard requires the 'party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'" *Id.* (citing 6A Charles Alan Wright *et al.*, FEDERAL PRACTICE AND PROCEDURE § 1522.1 (2d ed. 1990)).

If there is no need to adjust or extend the court-imposed scheduling order to allow the proposed pleading amendment, the standards of Rule 15—rather than both Rule 16 and Rule 15—applies.  Under Rule 15, the district court may consider such factors as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment.  *See Schiller v. Physicians Resource Group*, 342 F.3d 563, 566 (5th Cir. 2003); *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993).

In this case, the May 26, 2006 deadline was for filing pleading amendments without seeking leave of court.  (Docket Entry No. 10).  Since March 2006, when the plaintiffs first sought collective-action treatment, they have made it clear to both the court and the defendants that they wanted to proceed on that basis.  The defendants had ample opportunity to, and did, conduct discovery on whether this case was appropriate for collective action

22

certification.   (Docket Entry No. 19).   Allowing the collective-action allegation to be included in a third amended complaint will not require additional discovery to avoid prejudice to the defendants.   Adding this claim will not require modification to the scheduling order such that Rule 16 would apply.   The motion for leave to amend to add the collective-action claim is granted.   (Docket Entry No. 39).

2.   *A Centralized Policy: Collective Action Treatment of a Misclassification Claim*

The defendants argue that no allegation or evidence of a centralized policy or custom violating the FLSA has been presented.   The plaintiffs respond that their classification as exempt employees is the challenged centralized policy.

The courts have recognized that when collective treatment is sought based on a misclassification claim, two issues are presented: first, whether the mere classification as exempt is sufficient to establish that the putative collection action members are similarly situated, or whether each individual's job duties must be scrutinized; and second, the degree to which evidence regarding the named plaintiffs' job duties can be applied to other employees. *Holt v. Rite Aid Corporation*, 333 F.Supp.2d 1265, 1270 (M.D. Ala. 2004); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216 (D. Conn. 2003).

The members of the proposed opt-in class and the plaintiffs have the same job title, Developmental Coach Leader, but employees with the same job title are not "similarly situated" for the purposes of an "opt-in" FLSA class if their day-to-day job duties vary substantially.  *See Morisky v. Public Srvc. Electric & Gas Co.*, 111 F. Supp.2d 493, 498

(D.N.J. 2000) (for the purposes of a misclassification claim, "similarly situated" must be "analyzed in terms of the nature of the job duties performed by each class member, as the ultimate issue to be determined is whether each employee was properly classified as exempt"). This is not a case in which the plaintiffs rely on a job description to support certification as a collective action.  Instead, the plaintiffs are arguing that as a matter of fact, rather than of formal job description, they perform nonmanagerial duties for the majority of their working hours.  This requires an analysis of each employee's job responsibilities under the relevant exemption criteria.  *See Morisky*, 111 F. Supp. 2d at 495, 499 n.8 ("Technical Analysts" working for the defendant were not similarly situated when the evidence showed that each had a different focus to the work); *Tumminello v. U.S.,* 14 Cl.Ct. 693, 696 (Ct. Cl. 1988) ("employees within the Defense Mapping Agency of similar grade (GS-11) and job category (Electronics Technician) were not similarly situated because they were employed in different federal agencies and in various job categories).

The plaintiffs argue that the majority of their time was spent performing similar routine duties that are nonmanagerial because they require little discretion and did not include authority to hire, fire, or discipline.  The evidence in the record, however, shows that the Developmental Coach Leaders had significant variation in the tasks they are required to perform and the amount of time they spend on the different tasks, but also have significant variation in the amount of discretion each Coach Leader exercises.  The record shows that the Developmental Coach Leaders have different job duties from each other, depending on the duties assigned by their individual managers, whether they had specialized duties, the

team they supervised, and other variables.  The record shows that each Developmental Coach Leader's duties varied over time, depending again on the different orders given by the individual ASM, the employees they were supervising, and their specialized duties.  (Docket Entry No. 37, Ex. B at ¶10, Ex. C at ¶14; Docket Entry No. 56, Ex. B-6 at 88–89; Docket Entry No. 62 at 23; Docket Entry No. 37 at 4).  Finally, the record shows that there is considerable variation in the amount of discretion the Developmental Coach Leader bring to their duties.

The record shows considerable variation in the time spent on monitoring the Service Representatives' work and documenting the results of that monitoring.  Plaintiff Amie estimated that she spends approximately 80% to 90% of her work monitoring Service Representatives.  (Docket Entry No. 37, Ex. F at 61).  Plaintiffs DeLeon, Amie, Sanchez, and Aguirre estimate that they spend, respectively, "the majority," 85%, 85%, and 75% of their time "monitoring [employees] and completing associated paperwork."  (Docket Entry No. 28, Ex. A at 8, Ex. B at 8, Ex. D at 8, Ex. E at 8).  The plaintiffs have identified testimony by Aguirre that  there were times during the year that she spent only "a couple of hours" in a week observing Service Representatives.  (Docket Entry No. 62 at 20). Nonplaintiff coach leader King estimated that disciplinary duties took from 30% to 70% of her time and administrative duties took from 30% to 50% of her time, depending on the circumstances.  (Docket Entry No. 37, Ex. B at 141).  Plaintiff Amie spent 12 hours a day on paperwork related to attendance, such as FMLA or disability requests.  (Docket Entry No. 56, Ex. B-8 at 171).

25

The record also shows that some Developmental Coach leaders are assigned to specific duties that other Developmental Coach Leaders do not have. Plaintiff Aguirre was a "Subject Matter Expert" on satellite dishes, responsible for working with vendors, keeping abreast of developments in these products and related services, and keeping the Service Representatives informed about these developments. (Docket Entry No. 37, Ex. B at ¶10, Ex. C at ¶14). Plaintiff Urdialez was responsible for "Consumer Experience Expectations," which address customer satisfaction. (Docket Entry No. 37, Ex. B at ¶10; Docket Entry No. 37, Ex. J at 87–89). Urdialez also assisted a nonplaintiff coach leader, King, with attendance duties that other Developmental Coach Leaders did not perform. (Docket Entry No. 37, Ex. B at ¶15). Plaintiff Ramos was responsible for managing sales generation, including maintaining the unit's incentive budget, creating sales incentives, and managing promotions. (Docket Entry No. 37, Ex. B at ¶14). Nonplaintiff Developmental Coach Leader Aguilar is the "Subject Matter Expert" on certain wireless services, responsible for working with vendor and with the Service Representatives on issues relating to those services. (*Id*. at ¶ 10). Nonplaintiff coach leader King was responsible for managing a team of twelve employees responsible for trying to retain customers, called the "retention team." (Docket Entry No. 37, Ex. B at ¶10). The record shows that such specially assigned duties do not overlap with other Developmental Coach Leaders' duties.

The record also shows that even the work common to Developmental Coach Leaders varied because they exercised varying degrees of discretion in performing that work. (Docket Entry No. 37, Exs. E, F. G). Some of the named plaintiffs exercised authority to

26

discipline Service Representatives by taking away monitoring rights (allowing the Coach Leaders to listen to calls without the Service Representatives' knowledge), while plaintiffs left that authority to their ASMs.  (Docket Entry No. 56, Ex. B-7 at 110–12; Ex. B-8 at 64–65; Ex. B-9 at 68–69; B-12 at 38–39; Ex. B-13 at 26–27; Ex. B-14 at 108–11).  The record also shows that the plaintiffs exercised different amounts of discretion in deciding when and whether to report low-performing calls to the ASM and to determine whether a Service Representative's performance was deficient in particular aspects.  (Docket Entry No. 37, Ex. L at 27–28, 121; Ex. M at 46–48, 70–72; Ex. J at 157).

The work of each Developmental Coach Manager differed from person to person and over time depending in large part on the Area Sales Managers' orders, which varied from ASM to ASM and changed throughout the year.  In cases with similar variability among the members of the putative class of allegedly misclassified employees, courts have refused to certify the case for collective treatment because an individual inquiry into each plaintiff's job duties is required.  *See, e.g.*, *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d at 1274–75 (nationwide or regional group of store managers or assistant managers were not similarly situated because analysis of the job duties actually performed was required to determine exempt status and the evidence showed that the job duties and the time spent on them varied from manager to manager); *King v. West Corp.*, 2006 WL 118577 (D. Neb. Jan. 13, 2006) (noting that because the ultimate issue to be determined was whether the employer properly classified certain employees as exempt, deciding whether members of this proposed class are "similarly situated" requires analyzing the nature of the job duties performed by each putative plaintiff

27

and refusing to certify putative class of allegedly misclassified managers because they had

different tasks and exercised different degrees of discretion); *Smith v. Heartland Automotive*

*Services, Inc.*, 404 F.Supp.2d 1144, 1153 (D. Minn 2005) ("The Court determines that

Plaintiffs have failed to demonstrate that they are similarly situated with respect to the

amount of control and discretion exercised by Store Managers in the class, and this

consideration weighs heavily against the action continuing as a collective one."); *Tyler v.*

*Payless Shoe Source, Inc.*, 2005 WL 3133763, at *5 (M.D. Ala. Nov. 23, 2005) ("Payless

presents evidence that Payless Store Managers experience differences in all three of these

categories. First of all, stores differ greatly in size and format, and necessarily offer different

job duties; some Store Managers run just one store while others run multiple stores. As a

result, it is reasonable to imagine that they have very different job duties."); *Mike v. Safeco*

*Ins. Co. of America*, 274 F.Supp.2d 216, 221 (D.Conn. 2003) ("Regardless of the possibility

that another employee's 'primary duties were to appraise damaged automobiles,' any other

plaintiff would also have to present specific evidence of his or her daily tasks, and the court

would have to apply the regulations on an individual basis.  Further, in order to determine

membership in the class Mike identifies in his Second Amended Complaint, the court would

have to engage in an ad hoc inquiry for each proposed plaintiff to determine whether his or

her job responsibilities were similar to Mike's."); *Morisky v. Public Service Elec. and Gas*

*Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) ("Plaintiffs have made no showing that the job

responsibilities of the named plaintiffs are the same or similar to those of the remaining

members of the proposed class, or that the opt-in plaintiffs could properly be classified as

non-exempt employees."); *but see Morden v. T-Mobile USA, Inc.*, 2006 WL 2620320 (W.D. Wash. Sept. 12, 2006); *King*, 2006 WL 118577 at *14.

In this case, the plaintiffs themselves acknowledge that "Plaintiffs do not have a consistent set of duties that they performed. The duties Plaintiffs performed are direct results of the Area Sales Manager's orders which changed throughout the year." (Docket Entry No. 62 at 23). The individual job differences among the Development Coach Leaders shows that they are not similarly situated either as to the amounts of time they spend on different tasks or the extent to which they exercise discretion in completing those tasks. *See* 29 C.F.R. §§ 541.1, 541.2. Given the fact-intensive nature of the exemption analysis, the plaintiffs have not shown that they are similarly situated so as to make collective treatment of their claims proper under section 216(b) of the FLSA. The renewed motion for certification and notice is denied. (Docket Entry No. 28).

## IV.    The Motion For Leave to Amend to Assert Additional Retaliation Claims

The plaintiffs have moved for leave to amend to add new claims of retaliation for five of the plaintiffs. Under the scheduling order entered on December 9, 2005, the deadline for amending pleadings without leave of court was May 26, 2006 and the discovery deadline was December 1, 2006. The plaintiffs filed this suit in September 2005. The first amended complaint, filed in December 2005, added plaintiffs. The parties conducted discovery, including deposing all the named plaintiffs. These depositions were completed on May 5, 2006. The second amended complaint, filed on May 25, 2006, added a retaliation claim for one of the plaintiffs, Sanchez. (Docket Entry No. 30). On July 18, 2006, long after those

29

depositions had been completed, the plaintiffs filed a motion to amend their pleadings to allege that five named plaintiffs besides Sanchez had been retaliated against after they filed this suit. The plaintiffs did not give the dates of the alleged retaliation. (Docket Entry No. 39).

The proposed third amended complaint adds retaliation claims for Aguirre, Amie, Deleon, Morris, and Ramos. The proposed amendment alleges that after this lawsuit was filed, the defendants retaliated by "placing the Plaintiffs on Informal Improvement Plans, effectively placing Plaintiffs on probation; subjecting Plaintiffs to hostile and abusive innuendo; increasing Plaintiffs' work load; and insisting that each Plaintiff complete her work load within eight hours each day despite the common knowledge and longstanding practice that each Plaintiff had previously required more than forty hours a week to complete her respective work load." (Docket Entry No. 40 at 7–8). In their motion for leave to amend, the plaintiffs assert that the remaining two named plaintiffs, Urdialez and Zertuche, suffered retaliation, (Docket Entry No. 39), but the proposed third amended complaint does not contain this allegation. (Docket Entry No. 40 at 7–8). The record shows that Zertuche retired in June 2005, before this suit was filed. (Docket Entry No. 56, Ex. B-13 at 15).

Plaintiff Ramos was deposed on April 12, 2006. In the deposition excerpts on file, Ramos provides no evidence that she was retaliated against after she filed suit. Plaintiff Deleon was deposed on April 10, 2006 and submitted affidavits on May 12, 2006 and January 25, 2007. The affidavits and excerpts from her deposition do not show that Deleon presented any facts relevant to retaliation. Plaintiff Zertuche was deposed on April 25, 2006

30

and submitted an affidavit on January 25, 2007. The affidavit and excerpts from her
deposition do not show that Zertuche presented any facts relevant to retaliation. Plaintiff
Amie was deposed on May 5, 2006 and submitted an affidavit on May 10, 2006. Plaintiff
Amie left SWBT September 30, 2005, about two weeks after this lawsuit was filed. (Docket
Entry No. 56, Ex. 8 at 25). The affidavit and excerpts from her deposition do not show that
Amie presented any facts relevant to retaliation. Plaintiff Aguirre was deposed on April 10,
2006 and submitted an affidavit on May 11, 2006. Neither the affidavit nor deposition
excerpts on file present any evidence as to retaliation she suffered after the suit was filed.
On January 25, 2007, long after her deposition and after the discovery deadline, Aguirre
signed an additional affidavit included in the plaintiffs' response to the motion for summary
judgment. That affidavit says:

> Furthermore, after I complained about the work conditions and
> overtime to SBC Human Resource [sic], my manager, Nancy
> Garcia, came into my office and told me that upper management
> at the DMG would retaliate. I responded that a retaliation would
> be illegal. At that point, she replied they would make it look
> like it was not a retaliation. In response, I told her that they
> should not do that, and I immediately stopped talking to her
> about the subject.

(Docket Entry No. 63, Ex. 5 at 4). There is no evidence as to any specific alleged retaliatory
steps.

Plaintiff Morris was deposed on April 10, 2006 and submitted an affidavit on January
25, 2007. This evidence does not mention retaliation. In an affidavit filed in January 2007,
Morris stated:

> Furthermore, after I filed a complaint about the work conditions and overtime with SBC Human Resource[sic], my manager, Nancy Garcia, came into my office and told me that they (the upper-management at the DMG) would retaliate against those who filed the complaint with Human Resources.  When I told her that retaliation would be against the law, she replied they (DMG upper management) would make it look like it was not a retaliation.  In response, I told her that I do not wish to continue the conversation with her because Human Resources directed me not to discuss that matter with anyone.

(Docket Entry No. 63, Ex. 10 at 4).  There is no description of specific alleged retaliatory steps.

The plaintiffs argue that the proposed additional retaliation claims should be granted under the liberal standards of Rule 15.  (Docket Entry No. 41 at 2–3).  The defendants argue that Rule 16 applies as well, because the proposed amendment came so late as to require an extension to the scheduling order.  The defendants argue that the plaintiffs "provide no explanation whatsoever" for their delay, much less good cause.  (Docket Entry No. 46).

"Rule 16(b) provides that a scheduling order 'shall not be modified except upon a showing of good cause and by leave of the district judge.' The good cause standard requires the 'party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'" *S&W Enterprises, L.L.C. v. SouthTrust Bank*, 315 F.3d 533, 535 (5th Cir. 2003) ("Rule 16(b) governs amendment of pleadings after a scheduling order deadline has expired.") (citing 6A Charles Alan Wright et al., Federal Practice and Procedure § 1522.1 (2d ed. 1990)).  "Only upon the movant's demonstration of good cause to modify the scheduling order will the more liberal standard of Rule 15(a) apply

to the district court's decision to grant or deny leave." *Id.*   Under Rule 16, a court is to examine:  "(1) the explanation for the failure to [timely move for leave to amend]; (2) the importance of the [amendment]; (3) potential prejudice in allowing the [amendment]; and (4) the availability of a continuance to cure such prejudice." *S&W*, 315 F.3d at 536.

 The record before this court shows that the plaintiffs did not give any indication that they would assert retaliation claims on behalf of named plaintiffs other than Sanchez until July 2006.  Each of the plaintiffs was deposed long before the proposed amended complaint adding the retaliation claims was filed.  Nothing in the deposition excerpts on file, or the affidavits submitted before they were deposed, put the defendants on notice that these plaintiffs would assert a retaliation claim.   Allowing this amendment would require reopening discovery to allow the defendants to redepose the five plaintiffs who now want to assert retaliation.  The defendants moved for summary judgment on the basis of completed discovery; to allow the amendment would also require an opportunity for additional motions for summary judgment on the retaliation claims. after the reopened depositions were taken. Because an extension to the discovery deadlines is required if the additional retaliation claims were added, the standards of both Rule 16 and Rule 15 must be met.

The plaintiffs could show good cause under Rule 16 for the delay in filing the proposed retaliation claims if, for example, the alleged retaliatory steps did not occur until shortly before the proposed amended complaint was filed, after the five plaintiffs seeking to add this claim had already been deposed.  But the plaintiffs have not provided any information as to when the retaliation they allege occurred, except to say that it was after they

joined the lawsuit.  If the information as to the retaliation was available earlier, the plaintiffs would have to explain why they did not move for leave to amend to assert it earlier.  In *S&W*, the plaintiff's motion to amend was denied because the plaintiff had knowledge of the facts on which the amendment was based, a recent court decision, before the deadline.  315 F.3d at 535.  The plaintiff explained that counsel failed to understand the impact of the decision at the time; the court rejected this explanation as inadequate.  *Id*. at 536 ("As the district court noted, the same facts were known to S&W from the time of its original complaint to the time it moved for leave to amend. S&W could have asserted interference with contract from the beginning, but fails to explain why it did not.").

In this case, the plaintiffs offer no explanation for the timing of the proposed third amended complaint that would add retaliation allegations for five plaintiffs.  Under Rule 16, the plaintiffs have the burden of showing good cause for the amendment that will require reopening discovery to permit the defendants to redepose the five plaintiffs on the alleged retaliation and to move for summary judgment as to those claims, if appropriate.  They have not met that burden.

Even under the more liberal standards of Rule 15, this proposed amendment fails.  The plaintiffs waited until after the defendants deposed each of them to allege retaliation claims.  There is no explanation for the delay in seeking leave to amend.  Because nothing in the discovery taken told the defendants that these plaintiffs would be asserting retaliation claims, the allegations worked a surprise.  Unless the defendants were given an opportunity for additional discovery, would result in prejudice.  Undue delay and prejudice are both

34

recognized grounds for denying leave to amend under Rule 15.

The motion for leave to amend to add the retaliation claims for plaintiffs other than Sanchez is denied.  (Docket Entry No. 39).

## IV.    Conclusion and Order

The plaintiffs' motion for leave to amend to file the third amendment complaint is granted as to the collective-action allegation and denied as to the retaliation allegations for plaintiffs other than Sanchez.  The defendants' motion to strike the  plaintiffs' renewed motion for conditional class certification and notice is denied, but the plaintiffs' renewed motion for certification and notice is denied.  (Docket Entry Nos. 28, 35, 39).  This court will rule on the defendants' motions for summary judgment and issue a date for the joint pretrial order and docket call as appropriate.

SIGNED on March 12, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge