## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| YOLANDA M. AGUIRRE, *et al.* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-3198 |
| | § | |
| SBC COMMUNICATIONS, INC., *et al.* | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

On September 13, 2005, Yolanda Aguirre, Ana Morris, Corina Ramos, Rose Urdialez, and Olga Zertuche filed this Fair Labor Standards Act suit against SBC Communications, Inc., Southwestern Bell Telephone Company, and Southwestern Bell Telephone L.P. These plaintiffs alleged that they were misclassified as exempt employees and not paid overtime when they worked more than forty hours in a week. In a December 8, 2005 first amended complaint, Nara Deleon (now Nara Ramirez), Sylvia Diahnn Sanchez, and Alejandra Amie were added as plaintiffs. On May 25, 2006, the plaintiffs filed a second amended complaint adding a claim that Sanchez had been retaliated against for joining the lawsuit. On July 18, 2006, the plaintiffs moved for leave to file a third amended complaint to seek collective-action treatment for the FLSA claims and to allege that five of the plaintiffs besides Sanchez had been retaliated against for filing suit. (Docket Entry No. 39). For reasons explained in a memorandum and opinion issued at Docket Entry No. 69, this court allowed the plaintiffs to amend the complaint to add the collective-action allegation but not the new retaliation

claims.

The plaintiffs sought conditional certification and court-ordered notice to putative members of a proposed class collective action, defined as Developmental Coach Leaders and Administrative/Attendance Coach Leaders working at SWBT after January 1, 2003. (Docket Entry No. 19). This court denied that motion on April 11, 2006, finding that the plaintiffs had failed to show that they were similarly situated to members of the putative class and that the misclassification claim was suitable for collective action treatment, as required for conditional certification and notice. (Docket Entry No. 26). On May 16, 2006, the plaintiffs filed a renewed motion for notice to the potential plaintiffs and for limited expedited discovery. (Docket Entry No. 28). This renewed motion sought conditional certification for a subset of the original proposed putative class. The renewed motion sought certification of a class only of Developmental Coach Leaders who worked at SWBT after January 1, 2003, on the basis that they were misclassified as exempt. No collective-action treatment was sought as to the Administrative/Attendance Coach Leaders. For reasons explained in a memorandum and opinion issued at Docket Entry No. 69, this court denied the renewed motion.

Southwestern Bell Telephone Company and SBC Communications, Inc. moved for summary judgment on the basis that they did not employ the plaintiffs. In a memorandum and order issued at Docket Entry No. 71, this court granted summary judgment for Southwestern Bell Telephone Company and SBC Communications, Inc. on all claims. The remaining defendant is Southwestern Bell Telephone, L.P. ("SWB").

2

The present memorandum and opinion addresses SWB's motion for summary judgment on the plaintiffs' misclassification claims and on Sanchez's retaliation claim. (Docket Entry No. 55). Based on a careful review of the pleadings, the motion and response; the present record, and applicable law, this court grants SWB's motion for summary judgment as to all the plaintiffs' misclassification claims and grants SWB's motion as to Sanchez's retaliation claim. Final judgment is entered by separate order. The reasons are explained in detail below.

## I.    Background[1]

### A.    The Misclassification Claims

The plaintiffs are current or former Call Center Managers, also called "Coach Leaders," in the Diverse Market Group (DMG) unit of the SWBT Call Center in Houston, Texas. (Docket Entry No. 55, Ex. 1 at ¶ 5). As Call Center Managers, the plaintiffs' primary responsibility was to supervise the work of the Call Center's Service Representatives, who handle incoming calls from Spanish-speaking customers. (*Id.*, Ex. 5 at 282-83). The calls can cover a variety of topics, including new orders and questions about billing or service.

---

[1]The record contains excerpts of depositions of all eight named plaintiffs (Docket Entry No. 55, Exs. 7–17; Docket Entry No. 63, Exs. 1, 8, 9); affidavits by plaintiffs Sanchez, Aguirre, Morris, Zertuche, and Deleon (Docket Entry No. 63, Exs. 3, 5, 10, 11, 12); affidavits by several employees of SWB or related companies, including an affidavit by Sophia Pena, an Associate Sales Director for SWB, Nancy Garcia, a former Associate Sales Director, Shelley McPeak, Executive Director-Management & Sales Compensation for AT&T Management Services, L.P., and Sharla Gordon, Associate Director of Human Resources for AT&T Services, Inc. (Docket Entry No. 55, Ex. 1, 2, 3, and 4); excerpts of the depositions of Cynthia Lynn Lehew, SWB's General Manager of Consumer Sales, and of Garcia (Docket Entry No. 55, Ex. 5; Docket Entry No. 63, Exs. 4, 6); documents about SWB's operations (Docket Entry No. 55, Exs. 19–21, 23–25); documents about the job performance of Sanchez and Aguirre (Docket Entry No. 55, Exs. 22, 29–32.; Docket Entry No. 63, Exs. 2, 7); and interrogatory responses (Docket Entry No. 55, Exs. 26–28).

When customers call, the Service Representatives not only respond to the purpose of the call, but also try to sell the caller additional services and products.  (*Id.* at 283-85).  The Service Representatives are hourly employees.  Their work is covered by a collective bargaining agreement with their union.  (*Id.*, Ex. 1 at ¶ 3).  The Call Center Managers are salaried employees.  They are supervised by the Associate Sales Director, also called the Area Manager.  (*Id.,* Ex. 1 at ¶ 2).  The Area Manager for the SWBT Call Center was either Sophia Pena or Nancy Garcia during the times relevant to this suit.  (*Id.*).

The plaintiff Call Center Managers worked in either the Developmental Section or the Administrative/Attendance Section of the DMG unit.  (Docket Entry No. 55, Ex. 1 at ¶ 4). The Developmental Managers and Administrative/Attendance Managers had different duties. The Administrative/Attendance Manager position was at times separated into two separate jobs, Administrative Sales Manager and Attendance Manager.

All eight plaintiffs worked as Developmental Mangers at the Houston DMG for different periods from September 2003 to the present.  (Docket Entry No. 55, Ex. 1 at ¶ 5). Although there were significant variations in the plaintiffs' job duties, the amount of time they devoted to specific tasks, the  level of discretion they exercised, and the degree to which they were supervised, the plaintiffs' basic responsibilities generally included: (1) supervising teams of Service Representatives ranging from fourteen to more than thirty individuals; (2) evaluating the performance of the Service Representatives' customer interactions using a lengthy Quality Performance Evaluation ("QPE") form and completing annual evaluations; (3) working with the Service Representatives to improve their performance ("coaching"); (4)

4

reporting performance problems to Area Managers and implementing any resulting disciplinary measures that were imposed by the Area Manager; (5) conducting grievance hearings under the Service Representatives' union contract and adjusting or denying grievances based on consultation with the Area Manager; (6) holding meetings with their teams of Service Representatives to review the team's overall performance and to review company policies, monthly promotions and new products; (7) motivating their team of Service Representatives ("hyping" and "blitzing"); and (8) participating in manager meetings and conference calls in which new products, procedures, and promotional campaigns were discussed.  Because there were variations among the plaintiffs' duties, the facts relating to each plaintiff is discussed in detail below.

In addition to serving as Developmental Managers, plaintiffs Sanchez, Amie, and Morris were also employed at different times as Administrative and/or Attendance Sales Managers at the DMG Call Center.  (Docket Entry No. 55, Ex. 15 at 95, Ex. 10 at 12, Ex. 8 at 56).  Administrative/Attendance Managers are generally responsible for supervising the performance and discipline of Attendance Clerks and senior Service Representatives. Administrative/Attendance Managers handle the administration of attendance issues for nonmanagement employees and administer "sales generation" for the DMG unit.  (Docket Entry No. 55, Ex. 2 at ¶ 4).  As Administrative/Attendance Managers, the plaintiffs' basic job responsibilities included: (1) supervising two to five Attendance Clerks and a team of experienced Service Representatives ("Back-fills") who provide troubleshooting and training to their less-experienced peers; (2) evaluating the performance of the Clerks and Back-fills;

5

(3) working with the Clerks and Back-fills to improve their performance; (4) reporting performance problems with the Clerks and Back-fills to Area Managers and implementing disciplinary measures the Area Manager imposed; (5) handling the administration of attendance issues for the nonmanagement employees; (6) working with nonmanagement employees to improve their attendance problems; (7) reporting attendance problems to the Area Manager and implementing disciplinary measures the Area Manager imposed; (8) conducting grievance hearings on attendance issues for Service Representatives and general grievance hearings for Attendance Clerks and Back-fills, and adjusting or denying grievances with input from supervisors; and (9) maintaining production sales records and the budget for monetary incentives offered to Service Representatives for achieving certain sales goals. Because there were significant variations in job duties, the amount of time devoted to specific tasks, the level of discretion exercised, and the degree of supervision imposed on each Administrative/Attendance Manager, the duties of each plaintiff are also discussed in detail below.

### 1.    *Yolanda Aguirre*

Aguirre began working for SBC in 1993. She was promoted to Call Center Manager and then Area Manager. (Docket Entry No. 40 at 3; Docket Entry No. 70, Ex. 41 at 46). In 2002, Aguirre asked for a demotion because of a high-risk pregnancy. She became a Call Center Manager in December 2002. (Docket Entry No. 70, Ex. 41 at 46). Aguirre was on disability leave from December 2002 to March 2003, returned to work for one month, then went on pregnancy-related disability leave again from April to September 2003. Aguirre

took a leave of absence following the pregnancy from October 2003 to the end of September 2004. (Docket Entry No. 70, Ex. 41 at 43-50). Between December 2002 and April 2003, Aguirre's supervisor was Area Manager Regina Watts.[2] (Docket Entry No. 63, Ex. 9 at 50, 78; Docket Entry No. 70, Ex. 41 at 43-45). During the one-month period that Aguirre reported for work under Watts's supervision, Aguirre's duties consisted of making sure that other managers' reports got out on time, sitting in on conference calls, and assisting in distributing performance rewards to Service Representatives. (Docket Entry No. 70, Ex. 41

---

[2] Aguirre has made inconsistent statements about her work as a Developmental Coach Leader supervised by Regina Watts. Aguirre testified that during the time she served under Watts, she had significantly reduced supervisory responsibilities. (Docket Entry No. 63, Ex. 5 at 4; Docket Entry No. 70, Ex. 41 at 50-51). In her April 10, 2006 deposition, Aguirre stated that Watts was her supervisor between December 2002 and April 2003. During this period, Aguirre only worked for one month – in March and April 2003 – and was on disability before and after that month. Aguirre testified that when she returned to work in October 2004 following her pregnancy and subsequent leave, her supervisor was Nancy Garcia. (Docket Entry No. 70, Ex. 41 at p. 36-50). According to her deposition, Aguirre only worked under Watts's supervision for a one-month period. However, in her January 2007 affidavit, Aguirre testified that she worked as a coach leader under Watts's supervision, with few supervisory duties, for a much longer and later period, between October 2004 and January 2005. (Docket Entry No. 63, Ex. 5 at p. 4). The inconsistency between the deposition and the affidavit is unexplained. While normally a court will not resolve such factual inconsistencies at the summary judgment stage, "[w]hen an affidavit is impeached by prior sworn testimony without sufficient explanation, the court must view that affidavit with profound skepticism. *See Herrera v. CTS Corp.*, 183 F.Supp.2d 921, 928 (S.D. Tex.2002). Indeed, it is within the court's discretion to disregard the affidavit altogether should the court determine that it is dealing with a 'sham affidavit.' *See Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (noting that the utility of summary judgment would be greatly diminished if courts were unable to screen out 'sham issues of fact')." *Texas Sales and Marketing, Inc. v. Distinctive Appliances, Inc.*, Civil Action No. H-05-3555, 2007 WL 399292, at *6 (S.D. Tex. January 31, 2007). In her deposition, Aguirre explained why Watts became her supervisor from December 2002 to April 2003 and why Aguirre's duties were altered during the single month that Aguirre actually reported to work during that period. Aguirre was in the middle of a high-risk pregnancy. Because of the pregnancy, she asked for and received a reassignment from Area Manager to Coach Leader with a reduced workload even for a Development Coach Leader. (Docket Entry No. 70, Ex. 41 at p. 46, 50-51). According to the deposition, the time Aguirre spent as a Coach Leader working under Watts, with reduced supervisory responsibilities, was limited to a one-month period and was part of the adjustments made for her pregnancy-related disability. In her affidavit, Aguirre conclusorily stated that she worked under Watts between October and January 2005 with reduced duties. (Docket Entry No. 63, Ex. 5 at p. 4). The inconsistency is neither explained nor accounted for. Under Fifth Circuit precedent, the affidavit testimony on this point is appropriately disregarded because it creates no more than a "sham issue of fact."

at 50-51).   When she returned to work as a Developmental Manager in October 2004,

Aguirre's supervisor was Area Manager Nancy Garcia.  (*Id.*, Ex. 41 at 45).  In November

2005, Sophia Pena, who had previously filled in for Garcia on a temporary basis, replaced

Garcia and became Aguirre's direct supervisor.  (Docket Entry No. 55, Ex. 7 at 38).

        Once she returned to work in October 2004, Aguirre supervised between twenty and

thirty-six Service Representatives.  (Docket Entry No. 70, Ex. 41 at 98, 100, 102).  She spent

"a lot of time" observing these Service Representatives, "anywhere between 70 to 75

percent" of her working hours.  (*Id.* at 102).  Aguirre observed the Service Representatives

by listening in on the phone calls that a Service Representative was handling and making sure

that the Representative was complying with company policies and procedures.  (Docket

Entry No. 55, Ex. 7 at 62-63, 102).  Aguirre used lengthy QPE forms that listed seventy-six

criteria for use in evaluating the Service Representatives' performance.  (*Id.*, Ex. 7 at 61).

The QPE form requires Call Center Managers to fill in a "YES," "NO," or "N/A" for

numerous categories, ranging from whether the Representative made an "Appropriate

Opening Statement" in a customer call, whether the Representative's call included "Facts

obtained in conversational flow avoiding long pauses, and sounds interesting and courteous,"

to whether the Representative made recommendations to the customer "with confidence and

enthusiasm."  (Docket Entry No. 55, Ex. 1A).  Some of the criteria called for straightforward

objective assessments and some required subjective judgments.  In addition to filling out

QPE forms, Call Center Managers such as Aguirre were also responsible for submitting

annual reviews of her subordinates, which again called for both objective reporting of facts

8

and for subjective assessments of the quality of the work.  (*Id.*, Ex. 7 at 105).

Based on what she observed in the work of the Service Representatives on her team, Aguirre would "coach" by "writing down good things and praising them for that, you know, to keep up the good job."  (Docket Entry No. 55, Ex. 7 at 129-30).  Aguirre acknowledged that the Service Representatives listened to her feedback and that those who changed their behavior to conform with her coaching improved their performance.  (*Id.*).

As a Call Center Developmental Manager, Aguirre had the authority to administer some disciplinary measures on Service Representatives who violated company performance policies. Aguirre could take away "monitoring rights," which allow a Service Representative to be observed by having the Developmental Manager sit side-by-side with the Representative rather than listening in on calls remotely without the Representative's specific knowledge.  (Docket Entry No. 55, Ex. 7 at 110-11; Ex. 8 at 63).  As a Call Center Developmental Manager, Aguirre could recommend taking other, more significant progressive discipline steps, as laid out in the Service Representatives' collective bargaining agreement.  Aguirre was responsible for writing up a "separation proposal" if the recommendation was to fire a Service Representative.  (*Id.* at 131-33).  Aguirre also served as a management representative in hearing union grievances involving Service Representatives.  Aguirre would consult with the Area Manager before the grievance hearings to decide on an appropriate response.  (*Id.* at 105-09).

In addition to her normal Developmental Manager duties, Aguirre was the DMG's "Subject Matter Expert" for satellite dish services.  (Docket Entry No. 55, Ex. 2 at ¶ 12).

9

This specific assignment required her to keep abreast of the latest information about satellite dish services, work with the marketing representatives for satellite dish services, and ensure that Service Representatives knew what issues to focus on in selling the product.  (*Id.*).

During the period relevant to this suit, Aguirre earned an annual base salary in excess of $1,000 per week.  (Docket Entry No. 55, Ex. 21).

### 2. *Sylvia Diahnn Sanchez*

Sanchez began working for SBC in 1981 and was promoted to Developmental Manager in 1995.  (Docket Entry No. 40 at 5).  She worked at the Houston DMG as a Developmental Manager under Nancy Garcia from September 2002 until December 2004.  At that time, Sanchez moved from the bilingual DMG unit to the English-speaking unit, where she was supervised by Area Manager Eric Martinez.  (Docket Entry No. 55, Ex. 14 at 60-62).  In July 2005, Sanchez was temporarily reassigned to the DMG unit under Garcia's supervision.  Sanchez became the Attendance and Administrative Sales Manager for the DMG unit.  In October 2005, Sanchez was permanently assigned to the DMG unit.  (*Id.*, Ex. 15 at 95).  Sophia Pena became Area Manager and Sanchez's supervisor in November 2005.  (*Id.,* Ex. 14 at 66).  Throughout her tenure as Attendance/Administrative Manager, Sanchez's superiors expressed concerns about her performance.  The facts relating to the performance evaluations she received and the informal and formal Performance Improvement Plans she was required to meet are described in detail below, in connection with the retaliation claim.  Sanchez's employment was terminated on May 22, 2006.  (*Id.*, Ex. 21).

When she worked as a Developmental Manager under Garcia and then Martinez,

Sanchez supervised teams of approximately twenty-one Service Representatives.  (Docket Entry No. 55, Ex. 14 at 74-75, 106).  She spent the bulk of her time observing and coaching the Service Representatives and filling out QPE forms based on her observations.  Sanchez testified that "for the most part, that was what we did was cover - was listen, you know, to coach, and to observe."  (*Id.*, at 103, 124).  The rest of her time was spent participating in conference calls and manager meetings.  (*Id.* at 103).  Sanchez had the authority to revoke Service Representatives' monitoring rights for violating company policies.  Such violations could include not offering customers a particular product or failing to make various required disclosures.  (Docket Entry No. 55, Ex. 14 at 108-110).  Sanchez could also recommend taking various steps along the progressive disciplinary process laid out in the  collective bargaining agreement.  Sanchez was responsible for writing up a "separation proposal" if the recommendation was to fire a Service Representative.  (*Id.* at 121-124).

As an Attendance/Administrative Manager, Sanchez directly supervised five Attendance Clerks and five Back-fills.  (Docket Entry No. 55, Ex. 1 at ¶ 14, Ex. 14 at 140).  She was responsible for evaluating their performance, working with them to improve their performance, recommending implementing disciplinary measures, and serving as a management representative in hearing their union grievances.  (*Id.*, Ex. 1 at ¶ ¶ 14-16).  Sanchez was also responsible as an Attendance/Administrative Manager for handling the administration of attendance issues for all nonmanagement employees, including all of the Service Representatives, Attendance Clerks, and Back-fills in the DMG unit.  (Docket Entry No. 55, Ex. 14 at 133).  Sanchez was responsible for keeping track of attendance for all of

these individuals, alerting the Area Manager to attendance problems, and following the Area Manager's directions on how to deal with individual discipline problems, such as through an informal discussion or formal discipline.  (*Id.* at 133-43).  Sanchez testified that she did not address attendance problems without first speaking to her Area Manager, stating that she was told "[n]ot to make a move until I talk to her."  (*Id.* at 143).  Sanchez testified that she spent "all day" working on her attendance duties.  (*Id.* at 150).

Sanchez also had responsibility for administering the "daily blitz," a monetary incentive offered to the Service Representatives to meet sales goals.  (Docket Entry No. 55, Ex. 15 at 156).  She participated in conference calls and trained Service Representatives in new software, terms and vocabulary, policies, procedures, promotions, pricing, and products.  (*Id.* at 156).  She explained that her training responsibilities consumed a lot of time: "Well, when you have all that training for over a 100 people at 10 people at a time, you know, it just takes a long time. . . . I had to do all the training and there's just not enough time in the day to do all that."  (*Id.*).

During the relevant period, Sanchez earned an annual base salary in excess of $1,100 per week.  (Docket Entry No. 55, Ex. 21).

> ### 3.   *Alejandra Amie*

Amie began working for SBC in 1975 and was promoted to Call Center Manager in 1980.  (Docket Entry No. 40 at 5).  She worked at the Houston DMG as an Administrative Manager under Nancy Garcia's supervision from September 2002.  Amie also took on the job responsibilities of the Attendance Manager in December 2004.  (Docket Entry No. 55,

Ex. 8 at 56).  In July 2005, Sanchez replaced Amie as Attendance/Administrative Manager and Amie became a Developmental Manager.  (*Id.* at 57).  Amie retired on September 30th, 2005.  (Docket Entry No. 55, Ex. 8 at 25).

When she was an Administrative Sales Manager in the DMG unit, before taking on the additional duties of Attendance Manager, Amie directly supervised two to six Back-fills. (Docket Entry No. 55, Ex. 8 at 56).  She estimated that this took up approximately ten percent of her time.  (*Id.* at 144).  When a complaint was lodged against a Back-fill, Amie would discuss the complaint with the Back-fill and work with that individual to improve performance.  (*Id.* at 135-36).  Amie had the authority to recommend that the Area Manager place a Back-fill on a positive discipline step.  (*Id.* at 138-39).  Amie completed annual evaluations for the Back-fills and represented management at grievance hearings.  (*Id.* at 149, 153).  As Administrative Sales Manager, Amie also disseminated important e-mails to employees, gathered information from other managers for reports, sent out sales reports, trained Representatives on new products and pricing changes, and was responsible for administering and keeping track of the unit's budget for daily incentive programs offered to encourage Service Representatives to meet sales goals.  (*Id.* at 126, 156-57, 162-65).  The amount of time Amie spent on these activities varied significantly.  She spent anywhere from five to thirty hours per week on budgeting and administering the incentives programs, and she conducted training on a weekly basis during some time periods but during other periods only held training on a monthly or bimonthly basis.

Once Amie took on the duties of Attendance Manager in addition to her

Administrative Sales position, she spent the great majority of her time handling the administration of attendance issues for all nonmanagement employees, including the Service Representatives, Attendance Clerks, and Back-fills in the DMG unit.  (Docket Entry No. 55, Ex. 8 at 171).  Amie testified that she spent twelve hours each day tracking attendance for the unit, having discussions with Service Representatives about attendance issues, and administering disciplinary measures.  (*Id.* at 170-73).  As Attendance Manager, Amie also supervised four to five Attendance Clerks.  (*Id.* at 169).  She was responsible for evaluating their performance, ensuring that they completed their assigned tasks, working with them to improve their performance, recommending and implementing disciplinary measures, and serving as a management representative in union grievance proceedings.  (*Id.* at 144-55).

As a Developmental Manager, Amie supervised twenty-two to thirty-five Service Representatives.  (Docket Entry No. 55, Ex. 8 at 171).  She spent eighty to ninety percent of her time observing the Service Representatives by listening in on phone calls from customers that the Service Representatives were handling and making sure that the Representatives were complying with company procedures.  Amie used the QPE form to evaluate Service Representatives' job performance.  (*Id.* at 61-62, 65).  Based on her observations, Amie would critique the Service Representatives and work with them to improve their performance.  (*Id.* at 61-62, 65).  She testified that she "would sit with them side by side, and basically just coach them through the call . . . point out what they did well, what they didn't do so well on, what they need to do to improve."  (*Id.* at 61-62, 65).  Amie completed annual evaluations for her team and held group meetings with them to discuss subjects such as

14

performance results or new rules and procedures.  (*Id.* at 122-23).  Amie had the authority

to discipline Service Representatives for violating company policies by taking away their

monitoring rights.  (*Id.* at 63-64).  Amie could also recommend steps along the progressive

disciplinary process laid out in the collective bargaining agreement.  Amie was responsible

for writing up a "separation proposal" if a Representative was recommended for job

termination.  (*Id.* at 114-121).  Amie served as a management representative in hearing union

grievances involving Service Representatives and would consult with the Area Manager

about the appropriate response.  (*Id.* at 111 ).  Amie also spent from one to six hours

participating in conference calls each week.  (*Id.* at 110-11).

During the relevant period, Amie earned an annual base salary in excess of $1,200 per

week.  (Docket Entry No. 55, Ex. 21).

### 4.    *Alana Morris*

Morris  began working for SBC in 1976 and was promoted to Call Center Manager

in 1994.  (Docket Entry No. 40 at 8).  She worked at the Houston DMG unit under various

supervisors.  Morris was an Administrative Sales and Long Distance Manager and at times

held the Attendance Manager position as well until March 2004, when she became a

Developmental Manager.  (Docket Entry No. 55, Ex. 10 at 7-12).  Morris retired on

November 18, 2005.  (*Id.* at 36-37).

When Morris was an Attendance and Administrative Sales Manager, she supervised

six to eight clerks and four to five Back-fills.  (Docket Entry No. 55, Ex. 10 at 7-12).  She

was responsible for ensuring that her subordinates knew what the company expectations were

and evaluating them to determine whether they met those expectations.  (*Id.* at 13-15, 25-27).

She relayed information about her subordinates' performance to her Area Manager, consulted

with her manager on how to handle performance issues, and implemented her manager's

recommendations.  (*Id.* at 13-16).  Morris testified that she did not offer her opinion on

disciplinary matters to her Area Manager but merely provided information on job or

performance deficiencies.  "I wouldn't say it was my opinion.  I would share with the area

manager the facts of what had occurred and based on looking at the file, I would, you know,

tell them well, this occurred.  Say another - this was another incident or what have you, and,

uh, so that the area manager could have all the facts." (*Id.* at 13-16).  Morris also served as

a management representative in union grievance hearings.  (*Id.* at 15).

    Morris had additional duties related to long distance services.  Morris was responsible

for keeping current with information on SBC's long distance services, making the Service

Representatives on her team aware of new information, and making sure that customer

problems with the long distance services were properly handled.  (*Id.* at 10-11, 20-21).

    After she became a Developmental Manager, Morris supervised a team of fourteen

to twenty-six Service Representatives.  (Docket Entry No. 55, Ex. 10 at 35).  She spent

seventy to seventy-five percent of her time "coaching . . . developing, observing . . .

answering their questions, making sure that they understood the promotions, the packages

that we had available. . . . Providing them with feedback . . . role-playing with them,

scheduling time for them to sit with one of their peers for peer coaching." (*Id.* at 45).  Morris

spent the rest of her time doing annual reviews of the Service Representatives she supervised,

serving as an informal management representative for union grievances and taking notes for the Area Manager during formal grievance hearings, jointly observing the Service Representatives with the Area Manager, participating in conference calls, and meeting with other managers.  (*Id.* at 39, 49-50).

During the relevant period, Morris earned an annual base salary in excess of $900 per week.  (Docket Entry No. 55, Ex. 21).

5.    *Nara DeLeon*

DeLeon began working for SBC in 1997 and was promoted to Call Center Manager in 1999.  (Docket Entry No. 40 at 5).  DeLeon worked as a Developmental Manager under a number of different supervisors between September 2002 and February 2005, when she resigned.  (Docket Entry No. 55, Ex.9 at 20-24).  As a Developmental Manager, DeLeon supervised between fourteen and twenty-three Service Representatives.  Her job duties included listening to Service Representatives' phone calls with customers and evaluating the Representatives' performance using the QPE form, providing the Representatives with feedback on how well they performed, doing annual evaluations of the Representatives, working with the Representatives to improve their performance using techniques such as role-playing, reviewing the Representatives' sales reports and telling them what products to push harder in their interactions with customers, participating in manager meetings and conference calls to discuss new procedures, sales results, and other topics, representing management in hearing union grievances, reporting poor or inappropriate performance by the Service Representatives to the Area Manager, and preparing separation proposals if the

recommendation was to fire a Service Representative. (*Id.* at 43-76). In disciplinary matters and union grievance proceedings, DeLeon emphasized that she would always consult her supervisor and follow her supervisor's directions on what actions to take. (*Id.* at 67-76).

During the relevant period, DeLeon earned an annual base salary in excess of $800 per week. (Docket Entry No. 55, Ex. 21).

### 6. *Corina Ramos*

Ramos began working for SBC in 1998. She was promoted to Call Center Manager in 2000. (Docket Entry No. 40 at 4). Ramos currently serves as a Developmental Manager in the Houston DMG unit. During the period relevant to this suit, Ramos supervised a team of between twenty and thirty Service Representatives. (Docket Entry No. 55, Ex. 11 at 29, 164). Ramos testified that "most of the time" she worked on "developing" her team, which included observing Service Representatives taking customer calls, evaluating the Representatives using QPE forms, and holding feedback sessions. (*Id.* at 54-71, 165, 187). If a Service Representative was performing below expectations, Ramos would meet with the Area Manager to determine how to address the problem. (*Id.* at 71-73). At the meeting, Ramos and the Area Manager "would look at the service rep's file or documentation to see if there had been any previous discussions regarding that issue. And then we determine, at that point what step to take next." (*Id.* at 73). Possible steps included having an informal discussion with the Representative or placing them on a Performance Improvement Plan. (*Id.* at 73-78). Ramos testified that while the ultimate decision on discipline was up to the Area Manager, the Area Manager asked for Ramos's point of view on these issues. (*Id.* at 78).

18

Ramos also participated in conference calls and manager meetings, represented management in hearing union grievances, and ensured that her team knew about the latest sales incentives for Service Representatives. (*Id.* at 165, 187).

During the relevant period, Ramos earned an annual base salary in excess of $900 per week. (Docket Entry No. 55, Ex. 21).

### 7. Rose Urdialez

Urdialez began working for SBC in 1978 and was promoted to Call Center Manager in 1997. (Docket Entry No. 40 at 4). Urdialez is currently a Developmental Manager at the Houston DMG unit and has been responsible for supervising between twenty and forty-five Service Representatives. (Docket Entry No. 55, Ex. 12 at 18-20). Urdialez testified that she would spend "[a]nywhere between maybe half a day to maybe six, seven hours" observing calls, evaluating Service Representatives' performance using QPE forms, and providing feedback to her team of Service Representatives. (*Id.* at 62-63). In feedback sessions, Urdialez would read the QPE evaluation to the Service Representative, make specific comments about the Representative's strengths and weaknesses, encourage that individual to continue doing the things she did well, and suggest ways to improve. (*Id.* at 51-52). Urdialez testified that she spent eighty percent of her time on the call center floor, and that, in addition to observing, evaluating and providing feedback, she would "hype" and "blitz" to encourage better performance. (*Id.* at 62-63). Urdialez described "hyping" and "blitzing" as "getting out on the floor and getting loud and getting rowdy, and being excited about the services that were being offered. We can recognize an employee's sales by maybe giving

19

Case 4:05-cv-03198   Document 74   Filed in TXSD on 09/30/07   Page 20 of 61

them a balloon or giving them - we had a yardstick with a little DSL rocket on it, and recognizing them for their good sales." (Docket Entry No. 55, Ex. 12 at 85). She also compiled Service Representatives' annual evaluations and met with them to review the evaluations. (*Id.* at 81-82).

Based on the information she obtained from her observations and interactions with her subordinates, Urdialez would notify her supervisor about incidents that she believed warranted disciplinary action. (Docket Entry No. 55, Ex. 12 at 49, 54-55). The Area Manager "would check, and she would tell us, 'I'll get back with you, and I'll let you know what steps we're going to take'. . . then she'll call us back in and say, 'Okay. Well, this is what we're going to do. I want you to go and put this person on a performance notice or a written reminder,' or whatever step of discipline they told us to carry out." (*Id.* at 50). Urdialez would also hear union grievances on behalf of management, although she would consult with her Area Manager before a hearing to decide how to deal with the grievance. (*Id.* at 63-65). She also participated in conference calls to receive training and information about new products and promotions and to discuss them. She also held "team huddles" to update her team on the new information she learned from conference calls and other sources. (*Id.* at 57, 82).

During the relevant period, Urdialez earned an annual base salary in excess of $900 per week. (Docket Entry No. 55, Ex. 21).

8.    *Olga Zertuche*

Zertuche began working for SBC in 1977 and was promoted to Call Center Manager

20

in 1997. (Docket Entry No. 40 at 4). Zertuche served as a Developmental Manager in the Houston DMG unit she retired in June 2005. (Docket Entry No. 55, Ex. 13 at 14-15). Zertuche supervised between sixteen and twenty-eight Service Representatives. (*Id.* at 17-18). She spent the majority of her time observing calls, evaluating performance using QPE forms, and providing feedback to her team of Service Representatives. (*Id.* at 23-24, 31-41, 43). To give feedback to Service Representatives, Zertuche would review the call, go over what items had and had not been checked off on the QPE form, and press the Representative to think about what she should do differently in future calls. (*Id.* at 36-41). She also completed the Service Representatives' annual evaluations and met with them to review the results. (*Id.* at 66).

Zertuche would report results of her evaluations to the Area Manager. (Docket Entry No. 55, Ex. 13 at 27-28, 44-46). Generally, Zertuche would only speak with the Area manager about below-average QPE results. (*Id.* at 44). This was the primary means by which the Area Manager learned about performance problems with Service Representatives. (*Id.* at 45-46). Based on the information Zertuche provided, the Area Manager would decide whether and how to discipline a Service Representative, and Zertuche would implement any disciplinary measures. (*Id.* at 26, 45). The Area Manager might direct Zertuche to address a performance issue through an informal warning, revoking monitoring rights, placing the Representative on a Performance Improvement Plan, or preparing a separation proposal. (*Id.* at 58, 61-64). Zertuche heard union grievances on behalf of management, although she consulted with her Area Manager before a hearing to decide how to deal with the grievance.

21

(*Id.* at 63-65).  She also participated in conference calls about once or twice every month to learn about upcoming sales promotions; spent about ten percent of her time reading e-mails about new procedures for sales promotions and "blitzes"; and would occasionally handle customer calls when the customer asked to speak with a manager and Back-fills were not available.  (*Id.* at 42-43, 47-50).

During the relevant period, Zertuche earned an annual base salary in excess of $1000 per week.  (Docket Entry No. 55, Ex. 21).

### B.    Sanchez's Retaliation Claim

In the summer of 2005, Sanchez was assigned by Pena, then the Associate Sales Director of the DMG unit, to be Administrative/Attendance Manager.  (Docket Entry No. 55, Ex. 2 at ¶ 8).  In her deposition, Pena testified that she chose Sanchez for the position because "[s]he was new" and "we already had the teams established.  We wanted—I wanted to change things around, and I was going to give her the opportunity to do the attendance sales.  She was a "hypee" person, so, I figured she would do good in sales; and along with that, gave her attendance."  (Docket Entry No. 63, Ex.1 at 58).  Pena testified that Sanchez was "good with people.  She was good with, you know, the sales part of it.  You know, in order to promote sales you have to, to me, you have to have energy.  She had that energy." (*Id.*).

In August 2005, Garcia replaced Pena as manager of the DMG unit.  (Docket Entry No. 55, Ex. 2 at ¶ 8).  In Garcia's affidavit, she testified that by late August 2005, "it became clear to me that [Sanchez's] performance as the Administrative/Attendance Manager was not

meeting expectations and that [Sanchez] was not performing her attendance responsibilities correctly or completely." (*Id.*). Garcia testified that she held periodic, usually weekly, meetings with Sanchez and Kyle Corum, the District Attendance Staff Manager, to talk about concerns with Sanchez's performance. Sanchez's performance did not improve after those meetings. Garcia placed Sanchez on an Informal Performance Improvement Plan ("PIP"), also called a "Management Developmental Plan" or "MDP," in October 2005. (*Id.*).

SWB's records show that Garcia wrote a number of "Employee Documentations" about Sanchez. Most are about her performance problems.[3] (Docket Entry No. 55, Ex. 22). The first, on August 25, 2005, noted that Corum and Garcia had "held a discussion with [Sanchez] regarding expectations on doing the attendance job" and that Sanchez had "failed to maintain the spreadsheet in the shared drive." (*Id.*). The next entry, dated September 1, 2005, noted that Corum and Garcia had again met with Sanchez and that Garcia was "still very disappointed with the maintenance of the Brad Brown spreadsheet" and that Sanchez was "not following through on all expectations." (*Id.*). Garcia noted that Sanchez's response was to complain that she "is already working long hours and cannot keep up." (*Id.*). In the next entry, on September 6, 2005, Garcia wrote that she "received several emails requesting my assistance due to [Sanchez] not responding in a timely manner." (*Id.*). On September 9, 2005, Garcia wrote that she "held a very serious employee discussion" with Sanchez and she had "lots to go." (*Id.*). Garcia again noted that Sanchez said she "is working 12 hours

---

[3] Some entries do not express judgment about Sanchez's performance. The September 7, 2005 entry is an e-mail from Corum about particular attendance issues that Sanchez needed to handle. A September 14, 2005 e-mail followed up on those issues. Neither discussed deficiencies in Sanchez's performance.

a day and can only do so much." (*Id.*).  On October 10, 2005, Garcia wrote that Sanchez had

terminated an employee without notifying Lehew, as required, and that Sanchez had

"apologized and takes full blame." (*Id.*).   On October 11, 2005, Garcia wrote that she

advised Sanchez to be sure to respond to e-mails in a timely manner but Sanchez complained

that "she has no time to respond." (*Id.*).  On October 12, 2005, Garcia wrote that Sanchez

"has improved some but still has some work to do." (*Id.*).  On October 13, 2005, Garcia

wrote that she told Sanchez she "needs to stay on top of things"; again, Sanchez answered

that "she feels like there is not enough time in the day to complete all her job requirements."

(*Id.*).  In an e-mail attached to this entry, Corum wrote: "It is critical that you understand the

urgency I am expressing to you that you get organized and totally caught up.  I seriously am

considering changing your job duties soon even though you are against it." (*Id.*).  Sanchez

responded with an e-mail stating that "[t]here are not enough hours to do what you want.  I

am going on my 17th hour here." (*Id.*).  On October 14, 2005, Corum responded that

Sanchez was making her work take longer by doing "duplicate work." (*Id.*).  On October 14,

2005, Garcia sent Sanchez an e-mail stating that she "MUST do whatever it takes to stay on

top of your job. . . .  Immediate improvement is expected." (*Id.*).  On October 17, 2005,

Garcia wrote that she met with Sanchez and told her that she needed to "follow thru on all

expectation set forth by me or [Corum]." (*Id.*).  On October 21, 2005, Garcia wrote that

"much progress has been made in documentation and keeping spreadsheets caught up. . . .

Both [Corum] and I complimented [Sanchez] on her improved performance." (*Id.*).  On

October 26, 2005, Garcia made an entry by copying an e-mail detailing errors made in

24

Sanchez's work.  (*Id.*).  Garcia wrote that she had met with Sanchez and advised her that "unacceptable work performance cannot continue to be accepted" and that "I will be starting an MDP in November to measure her progress."  (*Id.*).  Sanchez replied that she had been "thrown into the unit" and "was never trained well in the first place."  (*Id.*).  On October 27, 2005, Garcia identified specific areas where Sanchez needed to improve.  (*Id.*).  On November 1, 2005, Garcia wrote her last entry.  Garcia "reviewed MDP on performance as attendance mgr. (see MDP on file) advised [Sanchez] will expect improvement within 30 days otherwise she may be moved to a formal plan."  (*Id.*).

In November 2005, Pena replaced Garcia as Associate Sales Director.  Pena was aware that Sanchez was on an informal PIP (also called an MDP).  (Docket Entry No. 55, Ex. 1 at ¶ 20).  Pena held periodic meetings with Sanchez about her job performance.  (*Id.*)  Pena testified in her affidavit that Sanchez's informal PIP was focused on "performance deficiencies relating to the administration of and positive discipline of Service Representatives for attendance."  (*Id.* at ¶ 21).  Pena delegated some of Sanchez's duties to other Coach Leaders to allow Sanchez to work on improving the areas in which she was most deficient.  (*Id.*).  Pena found that despite these steps, Sanchez's performance did not improve.  (*Id.* at ¶ 22).

Pena made a number of detailed "Employee Documentation" entries about Sanchez. (Docket Entry No. 55, Ex. 22).  On November 14, 2005, Pena wrote that Sanchez had failed to "cover with Meya Smith no refrigerators," "send documentation for Mireyah," and follow up on the "IPODS."  (*Id.*).  On November 30, 2005, Pena wrote that she had discussed with

25

Sanchez why she was "not covering the tardies on overtime," and Sanchez responded that "she did not have time." (*Id.).* Pena also noted that she discussed why Sanchez had not "cover[ed] Flor Garcia on her 2 days out. This is part of her IPIP." (*Id.*). Sanchez responded that there was "no time." (*Id.*). Pena wrote that she told Sanchez: "I know she can do this job she just needs to organize herself and do it." (*Id.*). CITE  On December 6, 2005, Pena wrote that Sanchez had "covered everyone and placed several reps on PD for attendance. Commended her for improvement on her PIP.  Advised continue with her improvement." (*Id.*).

On December 8, 2005, Sanchez joined this lawsuit.  (Docket Entry No. 13, Amended First Complaint).  On December 12, 2005, Pena wrote another "Employee Documentation" entry, stating that she continued to see many problems in Sanchez's performance.  Pena wrote that "the DSL save the sale was not turned in, the disability report was not updated," that Sanchez "needs to make sure that she does all coverage on attendance, has all reports turned in on time and accurate," that Sanchez needed to "not let Monica Heatherly use her P-card," and that $210 was missing from the October budget and Sanchez was responsible for keeping track of those funds.  Pena wrote that Sanchez was committed to doing her job and "will improve so that she can be removed from her IPIP." (*Id.*).  On December 20, 2005, Pena wrote that she had a meeting with Sanchez and discussed Sanchez's failure to bring records Pena had asked for, Sanchez's improper handling of an employee's suspension, and Sanchez's failure to print certain documents known as 9115 forms.  (*Id.*).  Pena wrote that she expected Sanchez to "bring me the attendance every morning call out log, with the

9115's and the pink form filled out and we would cover attendance to make sure she doing it correctly.  She is spending more time doing things 2 or 3 times because she does not do them correctly the first time."  (*Id.*).

On January 3, 2006, Pena wrote that Sanchez had "reported out ill."  On January 6, 2006, Pena wrote that Sanchez had called to say "her doctor has put her out."  On January 6, 2006, Pena wrote that Sanchez had been told to redo a separation proposal but had failed to do so.  (Docket Entry No. 55, Ex. 22).  From January 3, 2006 to January 9, 2006 Sanchez did not work due to illness; from January 10, 2006 to February 22, 2006, Sanchez did not work because of disability.  (Docket Entry No. 55, Ex. 20).  Sanchez returned to work on February 27, 2006."  (Docket Entry No. 55, Ex. 22).

On March 2, 2006, Sanchez was placed on a formal PIP.  (Docket Entry No. 63, Ex. 2).  In her deposition, Pena testified that her "intent was to put [Sanchez] on a formal in January," but she could not remember when she submitted the paperwork.  (Docket Entry No. 60, Ex. 1 at 38).  In her affidavit, Pena testified that she had told Sanchez that she was going to recommend a formal PIP before Sanchez left on disability leave.  (Docket Entry No. 55, Ex. 1 at ¶ 22, n.1).  Pena obtained the approval of her supervisor, Lehew, and SWB's Human Resources Department to put Sanchez on a formal PIP.  (*Id.* at ¶ 22).

The formal PIP stated that Sanchez "has not consistently performed her job responsibilities," "fails to update documents, document discussions with employees, and has not held timely reviews," "fails to cover attendance occurrence's [sic] with the reps, clerks or backfills within 24 hours," "[fails] to take the necessary step of Positive Discipline," and

27

"[fails to] document the discussions and positive discipline." The formal PIP stated that these deficiencies had persisted from August 2005 to April 2006. (Docket Entry No. 63, Ex. 2). In her deposition, Lehew testified that she approved the PIP but did not verify the underlying information. (Docket Entry No. 63, Ex. 4 at 203–04).

As part of the formal PIP, Pena met with Sanchez periodically to review her progress and carefully monitored her work. (*Id.* at ¶ 23). Pena frequently communicated with Sanchez to train her and help improve her performance. (*Id.*). Pena testified that despite the formal PIP, "[n]ot only was Sanchez not completing her work, but she was also failing to perform some of her work correctly." (*Id.* at ¶ 24). Pena testified that in their weekly meetings, Sanchez did not dispute the problems with her work. Instead, she repeatedly told Pena that she "did not have enough time to complete it." (*Id.*). Pena testified that she believed Sanchez's workload was "no different than the amount of work and scope of responsibilities given to other Administrative/Attendance Managers that I have supervised." (*Id.*).

On March 13, 2006, Pena wrote that Sanchez "has done all her ED's and given abeyance letters. Advised great job." (Docket Entry No. 55, Ex. 22). On March 27, 2005, Pena wrote that she advised Sanchez that her formal PIP would be extended thirty days, but that Pena had "some concerns." (*Id.*). After reviewing a situation involving one employee who claimed that Sanchez encouraged the employee to take more time off from work, Pena told Sanchez that "her job is to control our attendance and her responsability [sic] to advised the reps we need them back as soon as possible. We have the worst attendance of all

28

consumer [sic].  We are trending at 35 days per rep per year.  That really hurts the customers and the company.  She said she doesn't remember doing [encouraging the employee to stay out longer] and doesn't think she would say that."  (*Id.*).

On April 1, 2006, Pena wrote that she told Sanchez that her formal PIP would be extended thirty more days.  (Docket Entry No. 55, Ex. 22).  Sanchez had "improved on her discussions and documentation but still not following through on attendance work."  (*Id.*).  Pena  wrote that in response, Sanchez "started yelling and saying just get me out of my misery."  (*Id.*).  Pena told Sanchez that she was not firing her, but that Sanchez had the choice to resign.  (*Id.*).  Sanchez responded that she would not resign.  (*Id.*).  Pena wrote that Sanchez had not put the correct date on a letter, had not updated the disability report correctly, and had sent out a schedule incorrectly.  (*Id.*).  On April 12, 2006, Pena wrote that she met with Sanchez over particular performance problems, including that she had not followed through with concerns about a "DML," did not send in the disability report, did not "get the clerks to do their job," and did not "get the clerks to do the Bulletin boards."  (*Id.*).  On April 14, 2006, Pena wrote that Sanchez had given an employee more time off than the employee's contract allowed.  On April 18, 2006, Pena wrote that she advised Sanchez that she "is continueing [sic] to sent in the wrong report, not giving correct information regarding attendance to reps and needs to follow through on attendance issues."  (*Id.*). On April 26, 2006, Pena wrote that Sanchez had read an e-mail incorrectly and did not follow necessary steps to obtain medical records on an employee.  (*Id.*).  On May 2, 2006, Pena wrote that Sanchez asked whether the formal PIP would continue or whether she would be fired.  (*Id.*).

29

Pena said that Sanchez would not be fired.  In response, Sanchez "asked me for the 4th time why did I not just fire her."  (*Id.*).  Pena wrote that Sanchez needed to improve her performance because she made "wrong choices."  (*Id.*).

On May 3, 2006, Pena wrote that she told Sanchez that the formal PIP would be extended 30 more days.  (Docket Entry No. 55, Ex. 22).  In response, Sanchez said that she "wished I would just let her go.  She felt like she was going through a divorce."  (*Id.*).  Pena wrote that she wanted Sanchez to improve her job performance.  (*Id.*).  On May 16, 2006, Pena wrote, "I still have concerns on send reports in on time etc."  (*Id.*).On May 18, 2006, Pena wrote, "my concern is still she is not holding the clerks accountable, sending in wrong reports and giving wrong information."  (*Id.*). Pena recommended to her supervisor, Lehew, that Sanchez be terminated because of her performance.  (Docket Entry No. 55, Ex. 1 at ¶ 25).  On May 22, 2006, Pena wrote that Sanchez "was terminated for work performance." (Docket Entry No. 55, Ex. 22).

Pena testified in her affidavit that "Sanchez's failure to correctly or completely perform her attendance responsibilities was negatively affecting the business unit's ability to control attendance."  (Docket Entry No. 55, Ex. 1 at ¶ 25)..  Pena prepared a "Separation Proposal" for Lehew and SWB's Human Resources Department.  (*Id.*).  Pena was aware that Lehew and her supervisor, Brad Brown, approved the recommendation to terminate Sanchez's employment.  (*Id.*).  Lehew testified in her deposition that she approved Sanchez's termination in reliance on Pena's report and recommendation.  (Docket Entry No. 63, Ex. 4 at 258–59).  Lehew did not review the "supporting information that goes to HR."  (*Id.* at

30

259).  Lehew testified that it was her "expectation" that Pena followed the correct procedures in recommending Sanchez's firing.  (*Id*.).  Sanchez's "Employee Exit Package" stated the reason for her dismissal as "Dismissal for Work Performance."  (Docket Entry No. 55, Ex. 22).

SWB has moved for summary judgment on both the FLSA claims and Sanchez's retaliation claim.

## II.   The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln General Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action."  *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004).  This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence."  *Young v. Exxonmobil Corp.*, 155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson,* 477 U.S. at 255; *Young,* 155 Fed. Appx. at 800.  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

## III.    The FLSA Misclassification Claim

### A.      Limitations

32

A two-year statute of limitations generally applies to misclassification and unpaid overtime compensation claims brought under the FLSA. 29 U.S.C. § 255(a); *Singer v. City of Waco*, 324 F.3d 813, 821 (5th Cir. 2003). If an employer's statutory violation was "willful," a three-year statute of limitations applies. 29 U.S.C. § 255(a); *Singer*, 324 F.3d at 821. An FLSA violation is "willful" if the employer "knew or showed reckless disregard for . . . whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988), *cited in Singer*, 324 F.3d at 821. The plaintiff bears the burden of showing willfulness. *Karr v. City of Beaumont*, 950 F. Supp. 1317, 1325 (E.D. Tex. 1997).

SWB contends that the plaintiffs have not presented or identified evidence showing a willful FLSA violation. (Docket Entry No. 55 at 56). SWB argues that it has presented evidence showing that it sought to comply with the FLSA classification rules. (Docket Entry No. 55 at 56, Ex. 3 at ¶¶ 3-6). The plaintiffs did not respond to SWB's argument that no willful violation occurred. (S*ee* Docket Entry No. 62). SWB has met its burden as the moving party of identifying those portions of the record demonstrating the absence of a genuine issue of material fact. *Lincoln*, 401 F.3d at 349. SWB has submitted competent summary judgment evidence negating the plaintiffs' wilfulness claim. Specifically, SWB has submitted an affidavit from an SWB manager describing how SWB reviews all job positions in order to determine whether they should be classified as "exempt" or "nonexempt" under the FLSA. (Docket Entry No. 55, Ex. 3 at ¶¶ 3-5). The plaintiffs have failed to present or identify  evidence in the record that supports their claim of willful

33

violation.  SWB is entitled to summary judgment on the issue of willfulness.  The limitations period is two years.

### B.        The Misclassification Claims

Section 7(a)(1) of the FLSA requires employers to pay overtime at one and one-half times the regular rate to employees who work more than forty hours in a workweek.  29 U.S.C. § 207.  Section 13(a)(1) of the Act exempts employees occupying "bona fide executive, administrative, or professional" positions from the overtime requirements of section 7.  "The [section] 13(a)(1) exemptions are 'construed narrowly against the employer seeking to assert them,' and the employer bears the burden of proving that employees are exempt."  *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1224 (5th Cir. 1990) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).  Section 13(a)(1) authorizes the Secretary of Labor to define by regulation the terms used in the section.  These regulations are codified at 29 C.F.R. §§ 541.0–541.710.

SWB contends that the plaintiffs all fall under the "executive" exemption of 13(a)(1). (Docket Entry No. 55 at 25).  "[T]he inquiry into exempt status under [section] 13(a)(1) is intensely factbound and case specific."  *Dahlheim*, 918 F.2d at 1226.  Under the Department of Labor regulations, an employee is an exempt "executive" if four separate criteria are all satisfied.  The criteria are that:

1.        the employee is compensated on a salary basis at a rate of not less than $455 per week;

2.        the employee's primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or

34

subdivision thereof;

3.     the employee customarily and regularly directs the work of two or more other employees; and

4.     the employee has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a)(1)-(4).[4]

The plaintiffs do not dispute that they satisfy the salary requirement of the executive exemption. (Docket Entry No. 62 at 14). As managers at SWB, the plaintiffs at all times earned salaries that far exceeded the minimum to qualify for the executive exemption.

---

[4] The current regulations came into effect in 2004 and were not expressly made retroactive. *See* 69 Fed. Reg. 22122-01, 22122 (Apr. 23, 2004). Federal courts have held that the new regulations do not apply retroactively. *See, e.g., Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 369 (7th Cir.2005); *Tiffey v. Speck Enters., Ltd.*, 418 F.Supp.2d 1120, 1124 n. 3 (S.D. Iowa 2006); *Smith v. Heartland Auto. Servs., Inc.*, 404 F.Supp.2d 1144, 1148 n. 2 (D.Minn. 2005). The Fifth Circuit has refused to apply other FLSA statutory amendments that were not expressly made retroactive. *See Vela v. City of Houston*, 276 F.3d 659, 674 (5th Cir.2001). Before the 2004 revision, the Department of Labor regulations set out both a "long test" and a "short test" for determining whether an employee falls within the executive exemption, with the appropriate test determined by the weekly salary of the employee. *See Ale v. Tennessee Valley Authority*, 269 F.3d 680, 683-84 (6th Cir. 2001); *Kohl v. Woodlands Fire Dep't*, 440 F. Supp. 2d 626, 633 (S.D. Tex. 2006). The "long test" applied to employees earning more than $155 per week but less than $250 per week, while the "short test" applied to employees earning more than $250 per week. *Id.* Under the "short test," in addition to the minimum salary requirement, the employer was required to establish that the employee's primary duty consisted of management of the enterprise in which the employee was employed or of a customarily recognized department or subdivision thereof and that the employee regularly and customarily directed the work of two or more other employees therein. *Lott v. Howard Wilson Chrysler-Plymouth*, 203 F.3d 326, 332 (5th Cir. 2000). In addition to the increased minimum weekly salary requirement, the current test differs from the old "short test" in that it requires the employer to prove an additional element (that the employee has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or other change of status of other employees are given particular weight) to take advantage of the executive exemption. The current executive exemption test is at least as protective of employees as the earlier "short test." *Beauchamp v. Flex-N-Gate L.L.C.*, 357 F. Supp. 2d 1010, 1013 n. 3 (E.D. Mich. 2005). As a result, a defendant who can satisfy the more stringent criteria of the current test would satisfy the less burdensome demands of the "short test." Because this court finds that the plaintiffs fall under the executive exemption using the current regulations, there is no need to conduct a separate "short test" inquiry into activities that occurred before the revised regulations took effect.

(Docket Entry No. 55, Ex. 21).  The plaintiffs were paid a predetermined amount on a bimonthly basis regardless of the number of hours worked or the quality of work performed. (Docket Entry No. 55, Ex. 4 at ¶ 5).

The plaintiffs do dispute that they satisfy the other three criteria for the executive exemption.  Each of these criteria is examined against the summary judgment evidence.

### 1.    Primary Duty

The second criteria of the executive exemption to the overtime provisions of the FLSA requires that the employee's primary duty be management.  The regulations state that "management" generally includes, but is not limited to, activities such as: interviewing, selecting, and training employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning work; determining work techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment, or tools to be used or merchandise to be bought, stocked, and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.  29 C.F.R. § 541.102.  One court has held that "supervision of other employees is clearly a management duty," and that "[e]nsuring that company policies are carried out constitutes the very essence of supervisory

36

work." *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) (internal quotation omitted). *See also Reyes v. Tex. Ezpawn, L.P.*, 459 F.Supp.2d 546, 557 (S.D. Tex. 2006) (quoting *Donovan*); *Beauchamp v. Flex-N-Gate, L.L.C.*, 357 F.Supp. 2d 1010, 1017 (E.D. Mich. 2005) (same).

An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs." *Id.* at § 541.700. The regulations provide a nonexhaustive list of factors to consider in determining an employee's primary duty:

- the relative importance of the exempt duties as compared with other types of duties;

- the amount of time spent performing exempt work;

- the employee's relative freedom from direct supervision;

- the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee; and

- the frequency with which the employee exercises discretionary powers.[5]

*Id.* at § 541.700(a). The regulations stress that "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* "The presence or absence of any one factor is not determinative." *Thomas v. Jones Rests., Inc.*, 64 F. Supp. 2d 1205, 1214 (M.D. Ala. 1999). While the amount of time an employee spends performing exempt work is not the sole test in determining that employee's primary duty, an employee who spends more than

---

[5] This factor was eliminated when the regulations were revised in 2004.

fifty percent of her time performing exempt work "will  generally satisfy the primary duty requirement."  29 C.F.R. § 541.700(b).

In this case, the overwhelming majority of the plaintiffs' time as Developmental Managers was spent doing exempt work.  A number of courts have held that monitoring, evaluating, and providing feedback to employees to promote compliance with company policies constitutes exempt "managerial" work.  *See, e.g., Beauchamp,* 357 F. Supp. 2d at 1016-17; *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1269-70 (2004).  The record shows that the bulk of the plaintiffs' working hours as Developmental Managers was spent ensuring that the Service Representatives they supervised complied with company policies. The plaintiffs observed the Service Representatives handling customer calls, evaluated the Representatives' performance using QPE forms, provided feedback to the Representatives both on the handling of particular customer calls and in annual evaluations, worked to improve Representatives' performance through "coaching," "blitzing," and "hyping," and reported the evaluations of the Representatives – particularly negative evaluations – to the Area Manager.  (Docket Entry No. 55, Ex. 7 at 102, Ex. 14 at 103, 124, Ex. 8 at 61-62, 65, Ex. 10 at 45, Ex. 11 at 54-71, 165, 187, Ex. 12 at 62-63, Ex. 13 at 23-24, 31-41, 43).  This supervision was directed to achieving compliance with the company's sales procedures, policies, and requirements.

In their response to the summary judgment motion, the plaintiffs point to Aguirre's affidavit testimony that when she worked under Watts's supervision between October 2004 and January 2005, she only spent "once a week for a couple of hours" observing Service

38

Representatives to argue that none of the plaintiffs spent the majority of their time supervising subordinates. (Docket Entry No. 62 at 20). Aguirre's testimony does not raise a fact issue as to the work of the other plaintiffs as Developmental Managers. Moreover, Aguirre's affidavit contradicted her own earlier deposition testimony. In the deposition, Aguirre identified the period in which she worked under Watts's supervision and had little supervisory responsibility as a one-month period when her duties were limited because of a high-risk pregnancy. In the later affidavit, Aguirre testified that the period during which Watts was her Area Manager and she had few supervisory duties was between October and January 2005, which would be unrelated to any pregnancy. This inconsistency is unexplained. The affidavit creates no more than a "sham issue of fact" and is appropriately disregarded. *See infra* n. 2. It is clear that the substantial majority of Aguirre's time in the period relevant to this suit was spent observing Service Representatives.

Most of the plaintiffs' other duties as Developmental Managers, most notably handling employee grievances and implementing disciplinary measures, are also clearly "management" activities. The only tasks that any of the plaintiffs regularly engaged in that do not neatly fit in the "managerial" category are such administrative activities as participating in conference calls and meetings and checking e-mails on new product and sales information. The record shows that the purpose of these activities was to provide managers with the information necessary to complete their clearly managerial tasks. The undisputed facts in the record show that the great majority of the plaintiffs' time as Developmental Managers was spent on management duties or tasks that were directly ancillary to such

duties.

Most of the work performed by Sanchez, Amie, and Morris when they served as Attendance Managers was also exempt managerial work.  The record shows that Attendance Managers' primary duty was to ensure that company attendance policies were being carried out by monitoring the attendance of nonmanagerial personnel and having discussions with them about their attendance issues.  (Docket Entry No. 55, Ex. 14 at 133-43, 150, Ex. 8 at 170-171).  The plaintiffs' other attendance duties, including supervising clerks, evaluating their work, and working with them to improve their performance; hearing grievances; and disciplining for or reporting attendance problems, are also "managerial."  (Docket Entry No. 55, Ex. 14 at 133-43, Ex. 8 at 144-55, 169-171, Ex. 10 at 7-15).

The work that Sanchez, Amie, and Morris did as Administrative Sales Managers also in large part consisted of managerial tasks.  The administrative sales managers' duties included disseminating information to employees about changes in methods and procedures and sales incentives campaigns, gathering information from managers, maintaining sales records and sending out sales reports to employees, maintaining the unit's budget for the sales incentives campaigns and determining what kind of campaigns to do, "hyping" and "blitzing," providing training on new products and procedures, supervising Back-fills – including evaluating them and working with them to improve their performance – and hearing grievances.  (Docket Entry No. 55, Ex. 8 at 126, 156-57, 162-65, Ex. 15 at 140, 156).  Several of these duties fall within recognized categories of "managerial" activities, including training, supervising employees' work, hearing grievances, and disseminating  information

40

to employees  about changes in sales methods and procedures to ensure that company policies are carried out.  The plaintiffs' duties relating to maintaining the unit's budget for the sales incentives campaigns and determining what kind of campaigns should be used also appear to be within the exempt category of "planning and controlling the budget."  29 C.F.R. § 541.102.  While the Administrative Sales Managers were allocated a set amount for campaigns each month based on the number of employees in the unit, these managers were responsible for keeping track of the funds and working with the Area Manager to determine how to use the funds.  (Docket Entry No. 55, Ex. 8 at 126, 156-57, 162-65;, Ex. 15 at 156).  Amie testified that  "it's almost like keeping a checkbook . . . as I talked to my manager every day . . . [I] let her know how much we had in our budget . . . we kind of looked at the budget and see what we could afford to do."  (*Id.*, Ex. 8 at 163).  The plaintiffs' work gathering information from other managers and maintaining sales records is also within the exempt category of "maintaining production or sales records for use in supervision or control."  29 C.F.R. § 541.102.  The remainder of the job duties – sending out sales reports and information on campaigns to employees and hyping and blitzing – were to keep the employees under each manager's supervision motivated and informed, which is a managerial function.

Because the great majority of the plaintiffs' time as Developmental Managers and Attendance/Administrative Managers was spent performing managerial work, the relative importance of their exempt duties as compared with other types of duties was high.  This is not a case in which the managers regularly perform both managerial tasks and the tasks

performed by the employees they supervise.  *See, e.g.*, *Mims v. Starbucks Corp.*, Civil Action No. H-05-0791, 2007 WL 10369, at *4-5 (S.D. Tex. Jan. 2, 2007) (considering the relative importance of Starbucks managers' managerial duties when the "glorified baristas" spent seventy to eighty percent of their time waiting on customers, making drinks, and performing similar nonmanagerial tasks alongside their subordinates); *Moore*, 352 F. Supp.2d at 1273-75 (considering the relative importance of a store manager's managerial duties when the manager spent ninety-five percent of his time on nonexempt work).   In this case, the plaintiffs rarely, if ever, performed the same kinds of tasks as the Service Representatives, Clerks, or Back-fills they supervised.

Although there were significant variations in the plaintiffs' specific job duties, the amount of time they devoted to specific tasks, the  level of discretion they exercised, and the degree to which they were supervised, the plaintiffs' testimony shows that the job duties they performed were largely managerial.  The record reveals only scattered examples of several of the plaintiffs performing nonexempt work.  For example, Zertuche testified that she only spoke with a customer when there was a request to speak to a manager and a Back-fill was not available.  (Docket Entry No. 55, Ex. 13 at 47).   Zertuche's role as the first line of managerial oversight at the Call Center for her team was clearly more important to the company than the occasional duties she performed as a back-up to the Back-fills.   The performance of the plaintiffs' exempt managerial duties was critical to the Call Center's work.  (Docket Entry No. 55, Ex. 13 at 41-42. Ex. 11 at 18-21, Ex. 12 at 46-47; Ex. 8 at 202. Ex. 14 at 135).

42

Although the plaintiffs were closely supervised and required to apply detailed evaluation criteria and follow specified procedures in evaluating and supervising the Service Representatives, Clerks, and Back-fills, the plaintiffs exercised discretion in the performance of many of their duties.  Courts have held that the presence of detailed and well-defined standards and procedures do not eliminate managers' ability to exercise meaningful discretion in the exercise of their managerial duties, including the duties of evaluating subordinates.  The Second Circuit held in a case in which assistant managers in fast-food restaurants were bound by "a remarkably detailed routine" and their discretion was "circumscribed by prior instruction," that because the employer relied on the assistant managers to make discretionary judgments that could "make the difference between commercial success and failure," the managers were properly classified as exempt. *Donovan v. Burger King Corp.*, 675 F.2d 516, 521-22 (2d Cir. 1982).  The court reasoned that even when an employer "seeks to limit likely mistakes in judgment by issuing detailed guidelines . . . judgments must still be made."  *Id.* at 522.  Similarly, in *Beauchamp v. Flex-N-Gate L.L.C.*, the court found that the plaintiff manager of an automotive parts storage and sorting facility was covered by the executive exemption even though the facility was a "'closely controlled environment' in certain respects" because the employer had put in place "precise procedures"  that employees were required to follow.  357 F. Supp.2d at 1017.  The court explained that "nothing in the governing regulations or relevant case law requires that a supervisor must have unfettered discretion in the performance of his management duties in order to be deemed an 'executive.'"  *Id.*; *see also Poshly v. Eckerd Corp.*, 433 F. Supp. 2d

1287, 1301-04 (S.D. Fla. 2006) (finding that "[s]tore managers' need to exercise their discretion within the guidelines established by Eckerd does not undermine the importance of Plaintiffs' managerial duties or the discretion itself."); *Baudin v. Courtesy Litho Arts, Inc*., 24 F. Supp.2d 887, 893 ("Close supervision and established guidelines do not necessarily eliminate an employee's freedom and discretion").

Courts have found that employees may fall under the executive exemption even when their supervisors must regularly approve their managerial decisions.  In *Kastor v. Sam's Wholesale Club*, the court found that a bakery manager was exempt despite the fact his supervisor worked close by in the same location and the supervisor had to approve a number of decisions affecting the bakery department, including scheduling overtime, hiring and firing, and rearranging the department.  131 F. Supp. 2d 862, 867 (N.D. Tex 2001).  The court in *Haines v. Southern Retailers, Inc.* reached a similar result, holding that a store manager who was regularly visited by upper management and could not discipline her subordinates or decide to hire or fire them without managerial approval nonetheless qualified for the executive exemption.  939 F. Supp 441, 450 (E.D. Va. 1996).  The frequency with which a supervisor checks in on an employee does not determine whether that employee qualifies for the executive exemption.  In *Thomas v. Jones Restaurants*, the court found that the manager of a fast-food restaurant was "relatively free from supervision" despite the fact that his supervisor was "very hands on" and called ten to fifteen times a day and stopped by the restaurant three to seven days a week, because the manager was ultimately "answerable for the performance of the [restaurant]."  64 F. Supp.2d 1205, 1207 n. 4, 1214 (M.D. Ala

44

1999).

As Developmental Managers, each of the plaintiffs exercised significant discretion in evaluating Service Representatives and working with them to improve their performance. While the QPE forms circumscribed the plaintiffs' discretion by laying out the criteria for evaluating Representatives and limiting the manner in which the plaintiffs could provide feedback for each listed category ("YES," "NO," or "N/A"), deciding whether a Service Representative met each of the seventy-six criteria required the exercise of judgment and discretion.  (Docket Entry No. 55, Ex. 1A).  Some of the criteria are factual and objective, and required little independent judgment on the part of the Developmental Manager.  For example, one of the items on the QPE asked whether the Service Representative had verified a customer's existing telephone number.  (*Id.*).  But many other criteria require a subjective and discretionary evaluation, such as whether the Service Representative made recommendations to customers with "confidence and enthusiasm," whether the Representative sounded "interested and courteous," and whether the "[o]verall contact length [was] reasonable for [the] type of contact."  (*Id.*).  The plaintiffs also exercised significant discretion in providing feedback and working with their subordinates to improve their performance.  This aspect of the plaintiffs' work required each  plaintiff to recognize the particular strengths and weaknesses of each of the Service Representatives and to determine the best way to work with each Representative to improve performance.

The plaintiffs argue that they were not relatively free from direct supervision because they routinely required their supervisor's approval for various managerial decisions and

many of the tasks they performed were the product of direct orders from the Area Manager. (Docket Entry No. 62 at 20). Although the Area Manager would review the plaintiffs' written evaluations and ask about their interactions with various Service Representatives, no plaintiff testified that she was directly supervised as she observed, evaluated, provided feedback to, and coached her team of Service Representatives. (Docket Entry No. 55, Ex. 7 at 61-63, 102, 129-30, Ex. 14 at 103, 124, Ex. 8 at 61-62, 65, Ex. 10 at 45, Ex.9 at 43-76, Ex. 11 at 54-73, 165, 187, Ex. 12 at 62-63, Ex. 13 at 23-24, 31-41, 43). The record shows that the plaintiffs required the Area Manager's approval to impose formal discipline on a Service Representative. The plaintiffs also consulted with the Area Manager and followed that individual's directives before imposing all but the mildest disciplinary measures and before taking positions for management in grievance hearings. This evidence shows that the plaintiffs were subject to direct oversight in exercising several important managerial functions. But the record also shows that the plaintiffs were relatively free from direct supervision in the exercise of other important job functions. For the Developmental Manager position, the "direct supervision" consideration does not weigh heavily for or against finding that the primary duty of the plaintiffs was managerial.

Sanchez, Amie, and Morris exercised significant discretion in their Attendance and Administrative Sales Manager positions. These positions, like the Developmental Manager position, required the plaintiffs to evaluate and coach their direct subordinates, the Back-fills and Attendance Clerks. These managerial tasks involved the exercise of discretion. Although the actual taking of attendance is a relatively mechanical task and although the

46

Attendance Managers were to report all absences to the Area Manager, the Attendance-Manager plaintiffs had to determine when a pattern of unexcused absences was sufficiently serious to warrant bringing it to the Area Manager's attention. (Docket Entry No. 55, Ex. 14 at 133-43, Ex. 8 at 170-71).  Amie explained that  the guidelines for reporting to the Area Manager were not "set in stone. If you had a long-time employee who failed to call in one day for whatever reason, and they never did that again, it would not be an issue. If you had another employee who had one absence unexcused in, let's say, the last year, then have another – another one unexcused, well, then we're trending to have a problem. So you – you didn't just look at one thing. There was no numbers." (*Id.*, Ex. 8 at 173).  The plaintiffs also exercised discretion in their discussions with employees about attendance problems.  In addition, like the Administrative Sales Managers, these plaintiffs were required to exercise discretion in managing the campaign budget and determining what kind of campaigns to do, deciding how to conduct their training sessions, and figuring out what motivational  "hyping" and "blitzing" methods would be most effective. (Docket Entry No. 55, Ex. 8 at 126, 156-57, 162-65;, Ex. 15 at 140, 156; Ex. 10 at 14-15, 25-27).

The plaintiffs argue that as Attendance and/or Administrative Sales Managers, they routinely required the Area Manager's approval for various managerial decisions and many of their tasks were the product of direct orders from the Area Manager. (Docket Entry No. 62 at 20).  The plaintiffs point to Sanchez's testimony that "I have to ask my boss on everything, on everything.  It's not my decision, it's not my call, it's not - you know, I always have to ask," and that the Area Manager "directed me not to make a move without asking her

first," as illustrating the supervision that the plaintiffs were subject to as Attendance Managers. (Docket Entry No. 62 at 21; Docket Entry No. 55, Ex. 14 at 138). Sanchez's testimony concerned discipline decisions about attendance problems. (Docket Entry No. 55, Ex. 14 at 136-41). Sanchez was not referring to "everything" she did in her job, but rather "everything" relating to discipline decisions. The record shows that the Administrative/Attendance Manager plaintiffs required the Area Manager's approval before formally disciplining an employee for attendance problems; that these plaintiffs consulted with and followed the directives of the Area Manager regarding disciplinary matters and grievance hearings; and that these plaintiffs worked with the Area Manager to select sales campaigns. (Docket Entry No. 55, Ex. 1 at ¶¶ 14-16, Ex. 14 at 133-43, Ex. 15 at 156, Ex. 8 at 126, 138-39, 157, 162-65, Ex. 10 at 13-16). This evidence does show that the Attendance/Administrative Manager plaintiffs were subject to direct oversight in exercising some important managerial functions, particularly disciplining the employees they supervised. The record also shows, however, that these plaintiffs were relatively free from direct supervision in other important aspects of their jobs. For both the Attendance and Administrative Sales Manager positions, the "direct supervision" consideration does not weigh heavily for or against finding that the primary duty of the plaintiffs was managerial.

The undisputed evidence in the record shows that the plaintiffs' primary duties as Call Center Managers were managerial. SBC has shown that the second criteria of the executive exemption is met.

2.    *Directing the Work of Two or More Employees*

48

The third criteria of the executive exemption to the overtime provisions of the FLSA requires that the employee customarily and regularly direct the work of two or more employees. SBC has submitted evidence that during the relevant periods, the plaintiffs were in charge of supervising two or more employees. (Docket Entry No. 55, Ex. 14 at 74-75, 106, Ex. 1 at ¶ 14, Ex. 14 at 140, Ex. 8 at 56, 169-71, Ex. 10 at 7-12, 35, Ex. 10 at 35, Ex. 9 at 24-25, Ex. 11 at 29, 164, Ex. 12 at 18-20, Ex. 13 at 17-18; Docket Entry No. 70, Ex. 41 at 98, 100, 102). The plaintiffs argue that they do not satisfy this requirement because they only served as a "liaison" between the Area Managers and their employees, a "device through which information could be transpired more effectively." (Docket Entry No. 62 at 21). The plaintiffs assert that they did not have the authority to direct the work of the Service Representatives because those employees were required to follow the protocols set out in SBC's employee manual. (*Id.*).

Undisputed evidence in the record shows that the plaintiffs did not act as mere "liaisons" or conduits of information, but rather exercised meaningful discretionary oversight of the Service Representatives and other employees. While the SBC employment manual and other company materials set out detailed protocols for employee behavior, the plaintiffs customarily and regularly directed their subordinates' work to ensure that they complied with the written policies and protocols. *See Donovan v. Burger King Corp.*, 672 F.2d at 226 ("supervision of other employees is clearly a management duty" and that "[e]nsuring that company policies are carried out constitutes the very essence of supervisory work"); *Reyes v. Tex. Ezpawn, L.P.*, 459 F.Supp.2d at 557; *Beauchamp v. Flex-N-Gate L.L.C.*, 357 F.

Supp.2d at 1017 (manager was covered by the executive exemption even though the employer had put in place "precise procedures" that employees were required to follow).

The plaintiffs contend that there were extended periods when they did not satisfy the "two or more " requirement." (Docket Entry No. 62 at 21). The plaintiffs point to testimony in Aguirre's affidavit that she did not have supervisory responsibilities from October 2004 to January 2005. (Docket Entry No. 62 at 21-22; Docket Entry No. 63, Ex. 9 at 50-51). As noted, this testimony is different from that of other plaintiffs. It also contradicts Aguirre's own deposition testimony. In her deposition, Aguirre stated that the period in which she had little supervisory responsibility was limited to one month working under Watts as Area Manager in 2003, between disability leaves, when Aguirre was on a reduced work schedule because of a high-risk pregnancy. In her later affidavit, Aguirre testified that this period of nonsupervisory duties under Watts's supervision occurred in October 2004 to January 2005. This contradiction is not explained or accounted for and the later affidavit is appropriately disregarded. Even taking this affidavit into account, however, Aguirre has acknowledged that for most of the time she worked as a Developmental Manager, she exercised the supervisory functions that were the core of that position. (Docket Entry No. 70, Ex. 41 at 98-102; Docket Entry No. 55, Ex. 7 at. 61-63, 102, 105-09, 129-30).

The plaintiffs also point to testimony by Sanchez that "she never had a team" of Service Representatives when she worked under Area Manager Sophia Pena. (Docket Entry No. 62 at 22; Docket Entry No. 63, Ex. 8 at 50-51). However, Sanchez explained in her deposition that when she worked under Pena in 2003, she had no team of Service

Representatives because she was not a Developmental Manager.  (Docket Entry No. 55, Ex. 14 at 66, Ex. 15 at 95). Rather, Aguirre was working as an Attendance and Administrative Sales Manager under Pena.  As part of those job duties, Aguirre directly supervised five Attendance Clerks and five Back-fills.  (*Id.*, Ex. 1 at ¶ 14, Ex. 14 at 140).  The record shows that during the relevant periods, the plaintiffs customarily and regularly directed the work of two or more other employees.

### 3.    The Authority to Fire

The final criteria of the executive exemption to the overtime provisions of the FLSA requires that an employee have the authority to hire or fire other employees or make suggestions and recommendations as to the hiring, firing, advancement, promotion, or other status change and have those suggestions and recommendations given "particular weight." The Department of Labor has provided some additional guidance for determining whether an employee's suggestions and recommendations are given "particular weight":

> factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change and status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level management's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.105.

SBC has submitted evidence showing that the plaintiffs had the authority to recommend firing the employees they supervised and to report what they considered problems with those employees.  SWB has submitted evidence showing that the Area Managers considered and relied on the plaintiffs' recommendations and reports in making her own decisions about discipline, including job termination.  (Docket Entry No. 55, Ex. 1 at ¶¶ 9, 16-17, Ex. 2 at ¶¶ 11,15).  All job terminations required the approval of the Human Resources Department as well as the General Manager and Vice President who supervised the Houston DMG Area Manager.  Any job termination required a separation proposal prepared by the Call Center Manager.  (*Id.*, Ex. 2 at ¶ 11, Ex. 6 at 259-60).  The evidence submitted by SBC shows that recommendations to fire employees, submitted by the Call Center Managers, were given "particular weight."

This evidence shows that it was part of the plaintiffs' job duties to make recommendations about the employees they supervised, including recommendations to fire employees.  The fact that the Area Manager, Human Resources, and other managers made the final decisions on firing does not mean that the Call Center Managers' recommendations were not given weight.  The Department of Labor's interpretative guidelines state that "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have the authority to make the ultimate decision as to the employee's change in status."  29 C.F.R. § 541.105.

The plaintiffs argue that SWB has not satisfied the "authority to fire" prong of the

executive exemption because SWB did not present evidence that the plaintiffs had the authority to hire or fire employees.  However, the regulations clearly state that an employee need not have the sole or final authority to hire and fire, as long as the employee's suggestions and recommendations as to the hiring, firing, advancement, promotion or other change of status of supervised employees are given particular weight.  The plaintiffs have failed to present or identify evidence controverting SWB's evidence that the plaintiffs offered recommendations and suggestions on employees for whom discipline might be appropriate, including job termination, and that their recommendations and suggestions were given particular weight.  The summary judgment evidence shows that SWB has satisfied the final criteria for the executive exemption.

### C.    Conclusion as to the Misclassification Claims

The summary judgment evidence shows that as a matter of law, SWB is entitled to summary judgment on the plaintiffs' misclassification claims.  The evidence shows that although the plaintiffs had significant variations in the specific duties they had at different times during their work at SBC and in the amount of discretion they exercised at different times, their primary duties were managerial; they customarily and regularly directed the work of two or more other employees; and they made recommendations as to the firing and other discipline of these employees, which were given particular weight.  As a matter of law, the plaintiffs fall under the executive exemption to section 7(a)(1) of the FLSA.

### V.    Sanchez's Retaliation Claim

Sanchez alleges that SWB retaliated against her for filing this suit. Under the FLSA,

it is illegal for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."  29 U.S.C. § 215(a)(3).

An FLSA retaliation claim is analyzed using the *McDonnell Douglas* framework. *Kanida v. Gulf Coast Medical Personnel LP*, 363 F.3d 568, 577 (5th Cir. 2004).  Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as recently modified in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004), the plaintiff has the initial burden of making a *prima facie* showing.  To make a *prima facie* showing of retaliation, the plaintiff must show that: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the first two elements.  *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 317 at n.3 (5th Cir. 2007); *Lemaire v. Louisiana Dept. of Transp. and Development*, 480 F.3d 383, 388 (5th Cir. 2007).  An FLSA plaintiff must ultimately show that "the adverse employment action would not have occurred 'but for' plaintiff's protected activity." *Kanida v. Gulf Coast Medical Personnel LP*, 363 F.3d at 580.

If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to articulate a legitimate justification for the adverse employment decision.  *Cullwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006).  If a defendant can produce such evidence, the presumption dissolves. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43

(2000); *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). The plaintiff must

then offer evidence to create a fact issue "either (1) that the defendant's reason is not true,

but is instead a pretext; or (2) that the defendant's reason, while true, is only one of the

reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic

(mixed-motives alternative)." *Rachid*, 376 F.3d at 312 (internal quotation and alteration

marks omitted); *see also Cullwell*, 468 F.3d at 873; *Keelan v. Majesco Software, Inc.*, 407

F.3d 332, 341 (5th Cir. 2005) (analyzing a Title VII claim under the modified approach).

Sanchez has shown a protected activity – joining this lawsuit in December 2005 – and

an adverse employment action – her formal PIP in March 2006 and job termination in May

2006. SWB has presented competent summary judgment evidence of legitimate reasons for

placing Sanchez on a formal PIP and, after an extended period, firing her. The evidence

shows repeated problems with incomplete and deficient performance that did not improve

over time. The question is whether Sanchez has raised a fact issue as to a causal link

between her complaint and subsequent job discipline and termination.

The plaintiffs emphasize that Sanchez had not been subject to formal disciplinary

action from her hiring in 1981 until after she filed this suit. However, the record shows that

Sanchez had been on an informal PIP since October 2005, months before she joined this

lawsuit. The record shows that Sanchez's difficulties began when she was promoted to the

position of Administrative/Attendance Manager. Two different Area Managers, Garcia and

then Pena, thoroughly documented many problems in Sanchez's performance from August

2005 to December 2005, before she joined this suit.

Sanchez was placed on a formal PIP was in March 2006.  The decision to do so was made in January 2006, approximately a month after Sanchez had joined the suit.  Between December 2005 and March 2006, Sanchez and Pena had met several times and Pena had repeatedly counseled Sanchez on instances of deficient performance.  Sanchez was on disability leave from January to February 2006, but the decision to place her on formal PIP was made in January, before her disability leave began.  During the formal PIP, Pena and Sanchez met frequently.  Sanchez demonstrated sporadic improvement, which Pena recorded, but Pena's records show continued problems with the quality and the quantity of Sanchez's work.  Importantly, Sanchez did not deny the problems with her work.  Instead, Sanchez complained that she had too much work to do.  (Docket Entry No. 55, Ex. 1 at ¶ 25, Ex. 22).  The decision to fire Sanchez was made in late May 2006, six months after Sanchez joined this lawsuit.

In *Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir. 1992), the plaintiff filed an EEOC complaint in September 1988, the EEOC dismissed the complaint in September 1989, and the plaintiff was fired in September 1989.  In *Shirley*, the court found it "surprising that suddenly, after Shirley filed her EEOC complaint, problems with her work surfaced."  *Id.* at 43.  The district court in that case stated that "[i]t is especially noteworthy that after having been a faithful employee of this corporation for about nine years without ever having been reprimanded orally or in writing for any type of conduct, and having had prior experience in the loan related fields before working for Chrysler First, the defendant suddenly found three so-called flagrant indiscretions or violations."  (*Id.*).  A factual dispute over the plaintiff's

56

performance may support an inference of retaliation when combined with other significant evidence, such as "suspicious timing between her protected activity and her termination." *Shackelford v. Deloitte & Touche, L.L.P.*, 190 F.3d 398, 405 at n.4 (5th Cir. 1999). Conversely, if there is no factual dispute as to problems with the plaintiff's job performance, and if those problems began before the plaintiff engaged in protected activity, mere temporal proximity between the protected activity and job termination may not raise a fact issue as to retaliation. In *Strong v. University HealthCare System*, L.L.C., 482 F.3d 802 (5th Cir. 2007), for example, a plaintiff was fired three and a half months after she filed a Title VII discrimination claim. The court stated that temporal proximity alone was insufficient to show a causal link between the adverse employment action and the complaint. *Id.* at 808. The court noted that the plaintiff's "disciplinary record was not completely clean prior to her complaint; and [the plaintiff's] poor performance and improper conduct were not unsubstantiated when she was fired. To the contrary, reports of [the plaintiff's] disruptiveness came from every direction at [her workplace]: subordinates, equals, supervisors, and patients." *Id.*

In this case, the record shows that SWB had notified Sanchez of significant concerns over her work performance as an Administrative/Attendance Manager months before she joined this suit. The record also shows that Sanchez did not dispute that she was having problems completing her work or doing it satisfactorily. Instead, Sanchez consistently responded to complaints about her work performance by complaining about her heavy work load. There is no evidence that Sanchez's work load was made heavier after she joined the

lawsuit. To the contrary, the evidence shows that in response to Sanchez's complaints, some of her duties were shifted to other Coach Leaders so that Sanchez could focus on improving areas where her work was deficient. Despite this adjustment, the evidence shows that Sanchez continued to have problems in completing and performing her work. The record contains detailed documentation about the problems with Sanchez's work, both before and after she joined this lawsuit, and the efforts to have her improve. Despite these efforts, and despite sporadic reports of improvement, the detailed reports show a consistent and acknowledged failure to meet SWB's performance expectations and standards, and that this failure was repeatedly communicated to Sanchez.

The plaintiffs emphasize a statement in Aguirre's affidavit that after she "complained about the work conditions and overtime to SBC Human Resources," Area Manager Nancy Garcia came into her office and said that "upper management at the DMG would retaliate." (Docket Entry No. 63, Ex. 5 at 4). Such a remark can be powerful evidence of retaliation. Since the Supreme Court's decision in *Reeves v. Sanderson Plumbing Products, Incorporated*, 530 U.S. 133, 152 (2000), that a court should not exclude or discount "potentially damning" workplace comments merely because they "were not made in the direct context of [plaintiff's] termination," the Fifth Circuit has recognized that such comments can be important evidence. *See Auguster*, 249 F.3d at 404-05 (quoting *Russell*, 235 F.3d at 229) ("[I]n light of the Supreme Court's admonition in *Reeves*, our pre-*Reeves* jurisprudence regarding so-called 'stray remarks' must be viewed cautiously."). The Fifth Circuit has varied its approach for determining when "remarks" in the workplace are "stray"

58

or are probative of discrimination or retaliation.  Some decisions analyze the probative value of such remarks according to the extent to which they satisfy the following criteria: the remarks (1) were related to the protected class of persons of which the plaintiff is a member; (2) were proximate in time to the employment decision at issue; (3) were made by an individual with authority over the employment decision at issue; and (4) were related to the employment decision at issue.  *See, e.g., Patel v. Midland Mem'l Hosp. and Med. Ctr.*, 298 F.3d 333, 343-44 (5th Cir. 2002) (citing *Brown*, 82 F.3d at 655); *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001) (same).  Other Fifth Circuit cases state that the appropriately "cautious" post-*Reeves* test is that such statements can constitute evidence of discrimination or retaliation even when they are not in the direct context of the termination and even if made by one other than the formal decision-maker, as long as the speaker was in a position to influence the decision.  *Palasota*, 342 F.3d at 578; *Laxton v. Gap, Inc.*, 333 F.3d 572, 583 (5th Cir. 2003); *Sandstad*, 309 F.3d at 899.  A remark may be so deficient under one or more of these criteria—for example, remote in time from the challenged action or not made by one with any involvement in or influence on the decision–as to be a "stray remark" wholly lacking in probative value even as "indirect" evidence of discrimination or retaliation. *See, e.g., Auguster*, 249 F.3d at 404-405; *Patel*, 298 F.3d at 343-44; *Palasota*, 342 F.3d at 578; *Krystek*, 164 F.3d at 256; *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 329-30 (5th Cir. 1998); *Waggoner*, 987 F.2d at 1166.

In this case, Pena was the manager who promoted Sanchez to the position of Administrative/Attendance Manager in the summer of 2005.  In August 2005, Garcia

59

replaced Pena and shortly thereafter, began to write a number of Employee Documentations about Sanchez's performance problems.  Garcia's Documentations, however, were all written before Sanchez joined this lawsuit.  In November 2005, Pena again replaced Garcia.  Pena also wrote a number of detailed Employee Documentations about Sanchez's deficient performance.  These deficiency reports continued after Sanchez joined this suit.  It was Pena, not Garcia, who decided in January 2006 to recommend that Sanchez be placed on a formal PIP; who made the recommendation in March 2006 after Sanchez returned from disability leave; and who recommended that Sanchez be fired in May 2006.

There is no evidence as to when Garcia made the comment to Aguirre.  Importantly, there is no evidence in the summary judgment record that Garcia had any role in deciding to place Sanchez on a formal PIP or to fire Sanchez.

In this case, the undisputed evidence shows that Sanchez's performance problems began months before she joined this lawsuit.  There is no evidence that Sanchez engaged in any protected activities before she was added as a plaintiff.  The undisputed evidence shows that before Sanchez joined this lawsuit, she was placed on an informal PIP because of performance problems.  After she joined the lawsuit, the problems continued.  Sanchez was placed on a formal PIP and, after a number of counseling sessions achieved only sporadic and unsustained improvement, was fired.  Although the decision to place Sanchez on formal PIP was made approximately one month after she joined the suit, the decision to fire her was not made until almost six months after she joined the litigation.  During two of those six months, Sanchez was on disability leave.  Before and after her leave, Pena's detailed records

document continued efforts to improve Sanchez's work performance.  When those efforts were unsuccessful, Sanchez was fired.  Sanchez did not dispute that she had problems with her work, instead insisting that she simply had too much work to do.  Given this record, even considering Aguirre's statement as to Garcia's statement, a reasonable jury could not find that the decision to fire Sanchez was based on retaliation for her joining this suit, or that retaliation was a motivating factor for that decision.

SWB's motion for summary judgment as to Sanchez's retaliation claim is granted.

## VI.    Conclusion

SWB's motion for summary judgment is granted.  Final judgment will be entered by separate order.

SIGNED on September 30, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge